IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ASHUNTE SMITH,<br>KAIQUIN WANG,<br>CHRISTOPHER MARTIN, and<br>TRAVIS WILLIAMS<br>*Individually, and on behalf of a class of*<br>*Other similarly situated individuals,*<br><br>Plaintiffs,<br><br>v.<br><br>MIKE DEWINE and<br>ANNETTE CHAMBERS-SMITH<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.<br><br>**COMPLAINT**<br><br><br>Civil Rights Action<br>42 U.S.C. § 1983<br><br>Class Action |

Plaintiffs, Ashunte Smith, Kaiquin Wang, Christopher Martin, and Travis Williams, individually and on behalf of a class of similarly situated individuals, by their undersigned attorneys, file this Complaint for declaratory and injunctive relief against the Defendants, Governor of the State of Ohio Mike DeWine and Ohio Department of Rehabilitation and Correction Director Annette Chambers-Smith, and allege as follows:

## **INTRODUCTION**

1. Without immediate action by Governor DeWine and the Ohio Department of Rehabilitation and Correction (hereinafter "ODRC") to drastically reduce Ohio's prison population, COVID-19 will continue to ravage Ohio's twenty-eight prisons. The fallout from those infections will reach not only into the community surrounding the prisons but also into the small and large hospitals in surrounding counties, which will attend to the ill flooding through their doors in shackles.

1

2. As of March 2020, 48,765 individuals were incarcerated in Ohio.  Ohio's prisons utilize close living quarters, primarily relying on either cells or dorm-style units.  The nature of those units, in conjunction with work, worship, education, and food-service times guarantee non-compliance with social distancing guidelines as set forth by Ohio's Department of Health (hereinafter "ODH") as well as the United States Centers for Disease Control (hereinafter "CDC") and the World Health Organization (hereinafter "WHO"). The setting is comparable to that seen in nursing homes, cruise ships, and U.S. Navy warships, all of which have seen devastating outbreaks.

3. As of March 2020, ODRC employed 12,192 staff members, who may have unknowingly transported the virus into the prisons while asymptomatic.  Those staff members were denied the opportunity to wear appropriate face masks until April 2020, at which time they were provided with one mask offering limited protection.  The nature of prisons poses a significant risk of transfer between staff and prisoners as well as between staff and their communities.

4. The devastating COVID-19 attack within Ohio's prisons has resulted in exponentially increasing numbers of positive cases and a climbing death toll for both staff and prisoners. As of May 12, 2020, ODRC has reported that of 7536 tests given, 4439 have been positive. That is 59% of the tests given.[1]

5. The majority of correctional institutions have not been subject to wide-spread testing for COVID-19.

6. Marion Correctional Institution, which has received wide-spread testing, reported 177 members of the correctional staff tested positive and one member of the correctional staff

---

[1] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

died as a result.[2] At least 2,147 prisoners in the custody of Marion Correctional Institution have tested positive for COVID-19.[3] As of May 12, 2020, 13 prisoners have died.[4]

7. On April 8, 2020, Marion Correctional Institution reported having 2,518 prisoners in quarantine.[5] Of that figure, at least 2,147 have tested positive, meaning at least 85% of the population has been or continues to be COVID-19 positive.

8. Pickaway Correctional Institution, which has also received wide-spread testing, reported 108 members of the correctional staff had tested positive and one member of the correctional staff had died as a result.[6] At least 1,656 prisoners in the custody of Pickaway Correctional Institution have tested positive for COVID-19.[7] As of May 12, 2020, 30 prisoners have died.[8]

9. On April 8, 2020, Pickaway Correctional reported having 2,013 prisoners in quarantine.[9] Of that figure, at least 1,656 have tested positive, meaning at least 82% of the population has been or continues to be COVID-19 positive.

10. As of May 12, 2020, 49 prisoners have died as a result of COVID-19 while in the custody of ODRC.[10] That figure includes 13 from Marion Correctional Institution, 30 from

---

[2] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[3] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[4] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[5] ODRC - COVID-19 Inmate Testing – Updated 4/8/2020.

[6] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[7] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[8] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[9] ODRC - COVID-19 Inmate Testing – Updated 4/8/2020.

[10] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

Pickaway Correctional Institution, 1 from the Correctional Reception Center, 4 from Franklin Medical Center, and 1 from London Correctional Institution.

11. The number of COVID-19 positive inmates increases daily, but without wide-spread testing it is impossible to determine the full extent to which COVID-19 has infiltrated the remaining correctional institutions. Given the percentages at which Marion Correctional Institution and Pickaway Correctional Institution have tested positive, it is reasonable to conclude that the majority of prisoners in the custody of ODRC have been, are currently, or will be COVID-19 positive.

12. The consequences of COVID-19's raid into the prison system could have been largely avoided had Governor DeWine and ODRC acted with the same urgency and scope of restriction used for the state-at-large. Instead, thousands of prisoners have been left to languish in fear of the coming viral onslaught.

13. ODRC's manufacturing program, called "Ohio Penal Industries," has 30 shops in operation, with 1,506 prisoners working in prison shops. Those workers were not subject to Ohio's Stay at Home Order and, as such, continued to work without face masks, social distancing, or appropriate disinfectant.

14. Thousands of elderly, disabled, and medically vulnerable prisoners could be released to safely quarantine in their homes. Many of these prisoners are approaching release dates or are eligible for parole. The reduction of the general population through the release of prisoners, whether medically vulnerable or not, increases the safety of the remaining prisoners, staff, and surrounding communities. Those individuals who remain in the prisons with decreased general populations will be better able to distance and access adequate sanitation. The surrounding communities and medical facilities benefit if

prisoners are released to their homes, through the reduced opportunity for uncontrolled clusters in the prison communities.

15. To effectively reduce the continued spread of COVID-19 through the prisons, the state must take immediate steps to release or furlough individuals, who may still be subject to supervision and/or home detention with electronic monitoring.

16. Class members who are elderly and medically vulnerable, as well as those with pathways to release, must be immediately released. The remaining individuals must be provided with meaningful sanitation and protective measures including, but not limited to, hand sanitizer, bleach, soap, gloves, and disposal masks. The state failed to take meaningful action prior to COVID-19's silent creep into the prisons, but it is not too late to save lives and diminish the further spread. Without intervention from this Court, the State will continue to act without urgency, which will result in the needless deaths of prisoners, staff, and members of the community-at-large.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter in this Complaint pursuant to 42 U.S.C. § 1983.

18. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's cause of action arising out of the Constitution of the United States and 42 U.S.C. § 1983 and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

19. Venue lies in the United States District Court for the Southern District of Ohio pursuant to §1391 and §1392, because the events or omissions giving rise to Plaintiffs' claims stem from acts and practices across the State of Ohio. Plaintiffs reside in Allen, Marion, and Richland Counties. ODRC is headquartered in Franklin County, Ohio.

## PARTIES

20. Plaintiff, Ashunte Smith (A330043), at all times herein was a citizen of the United States and an ODRC prisoner in Marion Correctional Institution located in Marion County, Ohio. Mr. Smith is one of at least 2,147 prisoners who has contracted COVID-19 while incarcerated at Marion Correctional Institution. Mr. Smith was fifteen years old at the time he was arrested and has been in the custody of ODRC since 1996, when he was age seventeen. Mr. Smith is eligible for parole but was denied release at his first hearing.

21. Plaintiff, Kaiqin Wang (A766639), at all times herein was a citizen of the United States and an ODRC prisoner in Allen Correctional Institution located in Allen County, Ohio. Mr. Wang, a first-time offender, is serving an eighteen-month sentence on a non-violent drug offense and has been in the custody of ODRC since October 3, 2019. Mr. Wang is eligible for judicial release, but the Wood County Court of Common Pleas has denied his motion. Mr. Wang has diabetes, for which he takes insulin daily.

22. Plaintiff, Christopher Martin (A770038), at all times herein was a citizen of the United States and an ODRC prisoner in Richland Correctional Institution located in Richland County, Ohio. Mr. Martin is serving a fourteen-month sentence and has been in the custody of ODRC since October 25, 2019 as a result of a fourth-degree felony conviction for domestic violence in the Erie County Court of Common Pleas. During his incarceration, Mr. Martin has received support from at least one supervising corrections officer, who described Mr. Martin's conduct as that of a leader who has taken responsibility for his actions and is working to better himself and those around him.

23. Plaintiff, Travis Williams (A428428), at all times herein was a citizen of the United States and an ODRC prisoner in Marion Correctional Institution located in Marion County, Ohio.

Mr. Williams, like 2,147 other inmates in Marion Correctional Institution has tested positive for COVID-19. Mr. Williams suffers from numerous health issues including asthma and chronic pneumonia. His chronic pneumonia has repeatedly resulted in hospitalization. Mr. Williams requires medication which was not provided as required. He has been in the custody of ODRC since 2002.

24. Defendant, Mike DeWine, at all relevant times, has been and continues to be the Governor of the State of Ohio and, as such, is the ultimate executive authority over ODRC. Article III, Section 5 of the Ohio Constitution vests the "supreme executive power of the state" in the Governor.

25. Defendant, Annette Chambers-Smith, at all relevant times, has been and continues to be the Director of the Ohio Department of Rehabilitation and Correction. She is vested with authority over the ODRC pursuant to Ohio Revised Code § 5120.01, which states that prisoners committed to ODRC are under her legal custody.

## FACTS

26. COVID-19 is a new virus that is spread through person-to-person contact with spread more likely when people are within six feet of each other.[11] The State has stated: "[t]he virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs or sneezes," and that "[i]t may be possible that individuals can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose or eyes."[12] Dr. Amy Acton, Director of the State of Ohio's Department of Health, has issued orders

---

[11] CDC – Frequently Asked Questions: Coronavirus Disease 2019 (COVID-19) available at
https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics

[12] Ohio Exec. Order, No. 2020-01D (March 9, 2020).

demonstrating the State's knowledge that COVID-19 "can easily spread from person to person."[13]

27.  The WHO declared the COVID-19 outbreak to be a pandemic.  The State of Ohio, through Governor Mike DeWine's Executive Order, also declared a state of emergency "for the entire State" in order "to protect the well-being of the citizens of the [sic] Ohio from the dangerous effects of COVID-19." In that declaration, the State of Ohio makes clear that it is on notice that COVID-19 is a respiratory disease that can result in serious illness or death.[14]  The State of Ohio has further acknowledged that COVID-19 constitutes the presence of "a potentially dangerous condition which may affect the health, safety and welfare of citizens of Ohio."[15]

28.  "[P]eople are most contagious [with COVID-19] when they are most symptomatic (the sickest), however, some spread might be possible before people show symptoms." (Ohio Department of Health, Director's Order to Close Facilities Providing Child Care Services (March 24, 2020).) The State also acknowledges that "community spread" of COVID-19— meaning "transmission of an illness for which the source is unknown, means that isolation of known areas of infection is no longer enough to control spread"—has occurred in the U.S.[16]

29.  The Ohio Department of Health stated that "a large number of people in the general population, including the elderly and people with weakened immune systems and chronic

---

[13] (Ohio Department of Health, Director's Order to Close Facilities Providing Child Care Services (March 24, 2020).

[14] Ohio Exec. Order, No. 2020-01D (March 9, 2020).

[15] Ohio Exec. Order, No. 2020-02D (March 13, 2020).

[16] Ohio Department of Health, Director's Order to Close Facilities Providing Child Care Services (March 24, 2020).

medical conditions," face a "significant risk of substantial harm" due to "high probability of widespread exposure to COVID-19."[17]

30. The State indicated that gatherings of large numbers of people "increase[]s the risk of transmission of COVID-19.[18] The State has cited the "significant risk of substantial harm" due to "high probability of widespread exposure to COVID-19" as the reason for closure of all schools, polling stations, childcare facilities, and adult day care facilities and senior centers.[19]

31. "Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands," and required measures include, *inter alia*:

    a.    "Designate six-foot distances. Designating with signage, tape, or by other means six-foot spacing …"

    b.    "Having hand sanitizer and sanitizing products readily available…"

    c.    "Separate operating hours for vulnerable populations," for "elderly and vulnerable" people.

    d.    Organizations must "separate employees who appear to have acute respiratory illness symptoms from other employees and send them home immediately

---

[17] Ohio Department of Health, Director's Order to Close Facilities Providing Child Care Services (March 24, 2020).

[18] Ohio Department of Health, Director's Order In Re: Closure of the Polling Locations in the State of Ohio (March 16, 2020).

[19] Ohio Department of Health, Director's Order In Re: Order the Closure of All K-12 Schools in the State of Ohio (March 14, 2020); Ohio Department of Health, Director's Order In Re: Closure of the Polling Locations in the State of Ohio (March 16, 2020); Ohio Department of Health, Director's Order to Close Facilities Providing Child Care Services (March 24, 2020); Ohio Department of Health, Director's Order Re: Amended Director's Order to Close Facilities Providing Older Adult Day Care Services and Senior Centers (March 24, 2020).

32. Up to one in four people who contract COVID-19 remain asymptomatic, and contagion begins up to 48 hours before symptoms appear.[20] Transmission does not require coughing, and COVID-19 can be spread through merely breathing in the same area.[21] It is impossible to determine whether asymptomatic prisoners have COVID-19 and pose a risk to other prisoners unless or until they show symptoms of the virus.

33. ODRC does not have the capacity to provide constitutionally adequate medical care for all prisoners who may contract COVID-19. Overwhelmingly, Ohio prisons do not have adequate in-house health care facilities or medical staff to screen prisoners. The medical units of most ODRC prison facilities do not have ventilators or other medical equipment necessary to treat the number of people likely to contract COVID-19 that will require treatment. In the case of an outbreak, Ohio prisons do not have the means to transport high volumes of prisoners for off-site care.

34. ODRC only has two specialized medical facilities: the Franklin Medical Center and the Frazier Health Center at Pickaway Correctional Institution.[22] These two facilities do not have enough ICU beds, ventilators, or other space and equipment necessary to service the entire population of ODRC. Both locations are already facing substantial outbreaks.

35. In addition to equipment deficiencies, ODRC's staffing levels are unable to maintain safety standards as staff continues to contract COVID-19. ODRC staff in at least two prisons to-

---

[20] S. Whitehead, "CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'," *NPR* (April 2, 2020), available at https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us.

[21] E. Cohen, "Experts tell White House coronavirus can spread through talking or even just breathing," *CNN* (April 2, 2020), available at https://www.cnn.com/2020/04/02/health/aerosol-coronavirus-spread-white-house-letter/index.html.

[22] Ohio Department of Rehabilitation and Correction, "Office of Correctional Health Care," available at https://drc.ohio.gov/medical.

date, Marion Correctional and Pickaway Correctional, have been compromised so significantly that the Ohio National Guard has been sent to staff the prisons.[23]

36. Carceral settings are ideal for the spread of COVID-19. Prisons are places that are particularly susceptible to contagions, and incarceration poses a grave public health threat during this crisis. It is well-known in the epidemiological community that such facilities are "associated with high transmission probabilities for infectious diseases."[24]

37. When outbreaks occur in custodial facilities, those illnesses lead directly to increased spread beyond those institutions.[25] As stated by Chris Breyer, MD, MPH, Professor of Epidemiology at Johns Hopkins Bloomberg School of Public Health, "[i]t is therefore an *urgent priority* in this time of national public health emergency to reduce the number of persons in detention as quickly as possible."[26]

38. When outbreaks occur, prisoners inside prison walls have nowhere to shelter.[27]

---

[23] 10TV WBNS – State: Ohio National Guard members to help in 2nd prison: https://www.10tv.com/article/state-ohio-national-guard-members-help-2nd-prison-2020-apr

[24] Declaration of Chris Breyer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, filed in *United States v. Toro*, E.D. CA Case No. 19-cr-256, Dkt.145 (filed March 23, 3030) at ¶ 11; *see also* J. A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8):1047-1055 (2007), *available at* https://doi.org/10.1086/521910; L. M. Maruschak, *et al*., "Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12," U.S. Dept. of Justice, Bureau of Justice Statistics, NCJ 248491 (2015), available at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[25] *See* Beyrer Dec. ¶ 12.

[26] Beyrer Dec. at ¶ 17 (emphasis added).

[27] A. Sweeney and M. Crepeau, "Alarm grows as Cook County, state struggle with what to do with the incarcerated in the face of COVID-19," *Chicago Tribune* (March 31, 2020), available at https://www.chicagotribune.com/coronavirus/ct-inmate-release-coronavirus-concerns-20200331-ehtae5q2rfcihitehdx2wwruiu-story.html; K. Kindy, E. Brown, D. Bennett, "'Disaster waiting to happen': Thousands of Inmates Released as Jails And Prisons Face Coronavirus Threat," *Washington Post* (March 25, 2020), available at https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

39. As noted by Director Chambers-Smith on April 30, 2020, once COVID-19 has entered an institution, there is virtually no way to stop its progression.[28]

40. As of May 12, 2020, COVID-19 has entered all but four of Ohio's correctional institutions.[29] Of those four, however, two have prisoners with pending results from COVID-19 testing.

41. Outbreaks within the dense prison populations will quickly exhaust the resources of the rural communities in which the majority of Ohio's prisons are located. Cuyahoga County, Franklin County, and Hamilton County have the highest quality of health care facilities and the highest treatment capabilities in the state. Together, these three counties have nearly 1500 ICU beds.

42. Cuyahoga displaces 11,167 county residents to rural prisons to serve their sentences; Franklin County displaces 4,706 county residents into rural prisons to serve their sentences; and Hamilton County displaces 5,235 county residents to rural prisons to serve their sentences.[30] Ross County, Richland County, Pickaway County, Marion County, and Madison County each house well over 4,000 out-of-county prisoners.[31] Hospitals in these counties are woefully underprepared to handle institutional outbreaks. Richland county has only 37 ICU beds; Marion County has only 15 ICU

---

[28] Governor Mike DeWine – 4-30-2020 – COVID-19 Update: https://ohiochannel.org/video/governor-mike-dewine-4-30-2020-covid-19-update

[29] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[30] P. Wagner, R. Heyer, "Importing Constituents: Prisoners and Political Clout in Ohio," *Prison Policy Initiative* (2004), https://www.prisonersofthecensus.org/ohio/importing.html.

[31] *Id.*

beds; Madison County has only 13 ICU beds; Ross County has only 12 ICU beds; and Pickaway County has only 8 ICU beds.[32]

43. Ohio still lacks the ability to institute broad testing among the incarcerated and civilian populations.

44. ODRC implemented testing of all prisoners in three of the prisons: Marion Correctional, Pickaway Correction, and Franklin Medical Center. The results of those tests demonstrate a dangerous trend that is hurdling out of control within Ohio's prisons. As of May 12, 2020, 4,439 of the 7,536 of the tested prisoners have received positive test results.[33] Only approximately 15% of the prisoners in the custody of ODRC have been tested. Despite the lack of wide-spread testing, at least 9% of the prisoners in the custody of ODRC have tested positive for COVID-19. These numbers are staggering in light of the fact that meaningful testing is only occurring at three prisons. The actual number of infected individuals is unquestionably higher.

45. According to the CDC, WHO, and ODH, individuals at greatest risk include those over 65 years of age and/or those who have one or more of the following serious medical conditions[34]:

    a. People with chronic lung disease, including COPD or moderate to severe asthma;

    b. People who have serious heart conditions;

    c. People who are immunocompromised, including those receiving cancer treatments;

---

[32] F. Schulte, E. Lucas, J. Rau, L. Szabo, J. Hancock, "Millions of Older Americans Live in Counties with No ICU Beds as Pandemic Intensifies," *Kaiser Health News* (March 20, 2020), available at https://khn.org/news/as-coronavirus-spreads-widely-millions-of-older-americans-live-in-counties-with-no-icu-beds/.

[33] ODRC - COVID-19 Inmate Testing – Updated 5/12/2020.

[34] Center for Disease Control and Prevention, "People Who Are at the Highest Risk for Severe Illness," CDC.gov (April 15, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

    d.  People of any age with severe obesity (body mass index [BMI] >40) or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, renal failure, or liver disease;

    e.  People who are pregnant;

    f.  People with chronic kidney disease;

    g.  People with chronic liver disease; and,

    h.  People with diabetes.

46. The CDC has reported an increased rate of COVID-19 mortality in persons with underlying chronic conditions such as heart disease and diabetes, that may be underreported as they are not being directly recognized as COVID-19-related.[35]

47. More than 9,000 of Ohio's prisoners are over the age of 50.[36]

48. According to ODRC's 2019 Annual Report, thousands of prisoners have relevant diagnosed medical conditions. Of those prisoners, thousands have chronic respiratory or lung disease, creating an especially acute risk for COVID-19, including:

    a.  2,704 prisoners diagnosed with chronic medical issues categorized as "Asthma";

    b.  1,068 prisoners diagnosed with chronic medical issues categorized as "COPD";

    c.  23 prisoners diagnosed with chronic medical issues categorized as "ID-TB Disease";

    d.  276 prisoners diagnosed with chronic medical issues categorized as "ID-Latent TB Infection"; and,

---

[35] Preliminary Estimate of Excess Mortality During the COVID-19 Outbreak – New York City, March 11 – May 2, 2020: https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e5.htm.

[36] Ohio Department of Rehabilitation and Correction 2019 Annual Report, available at https://drc.ohio.gov/Portals/0/Annual%20report%20final%20ODRC.pdf.

e. 140 prisoners diagnosed with chronic medical issues categorized as "ID-Latent TB Surveillance."[37]

49. According to ODRC's 2019 Annual Report, 9,036 prisoners have diagnosed heart conditions categorized as "Cardiac/HTN."[38]

50. According to ODRC's 2019 Annual Report, nearly 1,000 prisoners are immunocompromised, creating an especially acute risk for COVID-19, including:

a. 396 prisoners diagnosed with chronic medical issues categorized as "ID-HIV";

b. 148 prisoners diagnosed with chronic medical issues categorized as "Cancer Active"; and

c. 428 prisoners diagnosed with chronic medical issues categorized as "Cancer Remission."[39]

51. According to ODRC's 2019 Annual Report, thousands have underlying medical conditions, particularly if not well-controlled or treated—as is likely the case due to the quality of prison medical care—create an especially acute risk for COVID-19, including:

a. 31 prisoners who are pregnant;

b. 6,339 prisoners diagnosed with chronic medical issues categorized as "Liver";

c. 2,862 prisoners diagnosed with chronic medical issues categorized as "Diabetes";

d. 5,574 prisoners diagnosed with chronic medical issues categorized as "Lipid";

e. 4,076 prisoners diagnosed with chronic medical issues categorized as "Gen Med";

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

f.  1,122 prisoners diagnosed with chronic medical issues categorized as "Seizure"; and,

g.  275 prisoners diagnosed with chronic medical issues categorized as "Chronic Pain."[40]

52. Medicaid Pre-Release Enrollment Program demonstrates thousands of prisoners with high-risk chronic medical issues:  in 2017 and 2018, 3,373 prisoners participated in the program while demonstrating "Critical risk indicators"—which include "HIV, HEPC, Pregnancy, MAT, Recovery Service Level 3, Chronic Medical Condition, Serious Mental Illness."[41]

53. Significant percentages of Ohio's prison population are especially vulnerable to serious complications from COVID-19.

54. Ohio's prisons, already over-populated, are especially susceptible to community spread.

55. The skyrocketing infection rate within Ohio's prisons demonstrates that the State's current policies are not functional, but, rather, are subjecting tens of thousands of Ohioans to infection, serious medical complications, and the statistically significant possibility of death.

56. In March 2020, ODRC suspended visitation including that for attorneys.  To date, that visitation remains suspended.

57. The ability to engage in attorney-client communication confidentially is handled on an institution-by-institution basis, with some institutions having no means by which attorneys can communicate with their clients confidentially.

---

[40] *Id.*

[41] *Id.*

58. There is no projected end to the COVID-19 pandemic. It is anticipated that multiple infection spikes will happen across the country, but at this time there is no end in sight without medical intervention by way of antiviral medications and vaccines, or through herd immunity if it is determined that immunity to COVID-19 can be achieved after infection.[42]

59. There is no timeline for the mass implementation of vaccinations in response to COVID-19. Currently, there is no vaccine nor is there any specific medication that can be used to prevent or treat COVID-19.[43]

60. Currently, scientists do not know whether surviving a COVID-19 infection will provide immunity against future infections.[44]

61. As COVID-19 rages, ODRC will continue to take prisoners from all of Ohio's 88 counties.

62. Although ODRC has temporarily suspended the transport of prisoners between facilities, this policy cannot remain permanent as the ongoing need to house prisoners of various categories remains ongoing.

## **CLASS ACTION ALLEGATIONS**

63. Plaintiffs bring this action pursuant to Rules 23(b)(1), 23(b)(2), and, in the alternative, 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

---

[42] Yale School of Medicine – COVID-19 is Here. Now How Long Will it Last? https://medicine.yale.edu/news-article/23446/ and Scientific American – How the COVID-19 Pandemic Could End: https://www.scientificamerican.com/article/how-the-covid-19-pandemic-could-end1/.

[43] WHO – Coronavirus disease (COVID-19) advice for the public: Myth busters: https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters.

[44] CDC – Clinical Questions about COVID-19: Questions and Answers: https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

64. The class that Plaintiffs seek to represent is defined as all prisoners currently or who will in the future be in the custody of ODRC and housed in an ODRC prison during the COVID-19 pandemic, the duration of which is yet unknown.

65. Plaintiff's request for release from physical custody includes:

    a. Prisoners serving a sentence for one or more convictions of a felony of the fifth degree or fourth degree;

    b. Prisoners serving a sentence for one or more convictions of a felony of the third degree if either of the following apply:

        i. The prisoner is serving a sentence on their first felony conviction; or,

        ii. The prisoner has served a minimum of half of their stated sentence;

    c. Prisoners serving a sentence for one or more convictions of a felony of the first degree, a felony of the second degree, or a mandatory prison term for an offense of violence if both of the following apply:

        i. The prisoner is fifty-five (55) years old or older; and,

        ii. The prisoner has served the greater of:

            1. ten (10) years; or,
            2. two-thirds of their sentence;

    d. Prisoners serving a sentence for aggravated murder, murder, or rape if all of the following apply:

        i. The prisoner is categorized at a security level not higher than Level Two;

        ii. The prisoner is fifty-five (55) years old or older; and,

        iii. The prisoner has served the greater of:

            1. The minimum term of their indefinite sentence; or,
            2. A term of at least twenty-five years of incarceration;

    e. Prisoners serving a sentence for any classified felony who have been determined a level one security level for a period of five or more years if all the following apply:

        i. The prisoner is serving a non-mandatory term;

      ii.   The prisoner is forty-six (46) years old or older; and,

     iii.   The prisoner has served the greater of eight (8) years or half of his or her sentence;

  f.   Prisoners serving a sentence for any non-violent drug offense who either have no mandatory sentence or who have served the mandatory portion of their imposed term;

  g.   Prisoners with a documented medical diagnosis which render them uniquely vulnerable to COVID-19 if:

      i.   The prisoner presents a certificate from a physician that the prisoner's condition or diagnosis renders the prisoner vulnerable to COVID-19; or,

      ii.   The prisoner has a documented diagnosis of any of the following:

1. chronic lung disease or moderate to severe asthma;
2. Serious heart condition;
3. Diabetes;
4. Severe obesity;
5. Renal failure or liver disease;
6. Long-running Hepatitis C;
7. Any diagnosis stating that the prisoner is immunocompromised, including but not limited to diagnoses of HIV or AIDS or cancer treatment.

66. A class action is the only practical means by which the individual named Plaintiffs and the class members can challenge the Defendants' unconstitutional actions. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

67. The class is so numerous that joinder of all members is impractical. Ohio's prisoner population exceeds 48,000 individuals. The number of prisoners currently diagnosed with relevant medical conditions is not available, but according to the ODRC's 2019 Annual Report more than 15,000 prisoners were diagnosed with relevant medical conditions.

## FIRST CAUSE OF ACTION
## UNLAWFUL VIOLATION OF THE EIGHTH AMENDMENT

68. Plaintiffs restate the allegations contained in paragraphs 1-67 as if fully restated herein and are Class Members being held post-trial.

69. The Eighth Amendment to the United States Constitution, as incorporated against the States pursuant to the Fourteenth Amendment to the United States Constitution, guarantees that prisoners may not be subjected to cruel and unusual punishment by state actors. Here, the state actors are required to provide adequate protection, prevention, and healthcare to the medically vulnerable Plaintiffs, but have been deliberately indifferent to the serious risk COVID-19 poses.

70. ODRC facilities lack the ability to adequately prevent COVID-19 and its spread and are unable to appropriately care for and ensure the safety of Plaintiff Class Members.

71. Defendants' actions and inactions have resulted in the exponential increase in COVID-19 infections within ODRC as they have failed to test, treat, and prevent COVID-19 outbreaks, resulting in a violation of Plaintiff's constitutional rights to treatment and adequate medical care.

72. Defendants' refusal to reduce prisoner population through immediate release have directly contributed to the unchecked spread throughout the prisons as release would increase the safety not only of the released prisoners but also of those remaining prisoners, staff, and communities.

73. By operating the ODRC facilities without the capacity to treat, test, or prevent a COVID-19 outbreak, Defendants, as participants and policy makers, have violated the rights of Plaintiff Class Members guaranteed by the Eighth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION
## UNLAWFUL VIOLATION OF
## ARTICLE I, SECTION 9 OF THE OHIO CONSTITUTION

74. Plaintiffs restate the allegations contained in paragraphs 1-73 as if fully restated herein.

75. Article I, Section 9 of the Ohio Constitution protects all persons from cruel and unusual punishments.

76. Defendants' failure to implement preventative measures for COVID-19, including testing, adequate sanitation, and the distribution of protective equipment to staff and prisoners allowed for the exponential spread of COVID-19 within the prisons. The prisons lack appropriate medical care, testing, and treatments for those infected. Defendants' continued confinement of Plaintiff Class Members constitutes a violation of Article I, Section 9 of the Ohio Constitution.

## THIRD CAUSE OF ACTION
## UNLAWFUL VIOLATION OF THE SIXTH AMENDMENT

77. Plaintiffs restate the allegations contained in paragraphs 1-76 as if fully restated herein.

78. The Sixth Amendment to the United States Constitution, as incorporated against the States pursuant to the Fourteenth Amendment to the United States Constitution, guarantees the right to the assistance of counsel for defense. Here, the state actors have foreclosed counsel's ability to confidentially communicate with prisoners.

79. ODRC does not have a plan for attorney-client communications that applies to each and every prison. Rather, individual prisons determine what communications methods will be employed.

80. In at least one prison, Richland Correctional Institution, legal mail sent by counsel to prisoners has been intercepted.

81. Multiple prisons have no unrecorded or unsupervised video or telephonic communication methods.

82. Visitation, a means by which attorneys were previously able to confidentially communicate with prisoner-clients, has been indefinitely suspended since March 2020.

83. Defendants' failure to institute a policy enabling the continuation of confidential attorney-client communications has violated the rights of Plaintiff Class Members guaranteed by the Sixth Amendment to the United States Constitution.

## **REQUEST FOR RELIEF**

84. Defendants' actions and inactions have violated Plaintiff Class Members' constitutionally guaranteed rights as outlined above and, as such, Plaintiffs are entitled a judgment against Defendants.

85. Plaintiff Class Members are entitled to injunctive relief ordering Defendants to provide adequate COVID-19 prevention, testing, and care including:

   a.  Provisions for adequate spacing of at least six feet between ODRC prisoners so that compliance with physical distancing guidelines may be achieved to prevent the continued spread of COVID-19;

   b.  Creation and institution of a safety plan to prevent additional COVID-19 outbreaks at institutions now or in the future;

   c.  Allow reasonable access to disinfecting products for the purpose of cleaning and disinfecting cells, common areas, dormitories, eating areas, worship areas, and individual items;

d. The immediate release of Plaintiff Class Members in order to preserve their safety and the safety of the remaining prisoners through population reduction so that adequate social distancing, quarantining, and treating may be accomplished;

e. The accelerated scheduling of parole hearings and re-hearings to review and re-review prisoners who have served their minimum terms of incarceration and are otherwise eligible for release;

f. If necessary, the implementation of a three-judge panel to reduce the prison population for the aforementioned reasons;

g. Test all Plaintiffs and correctional staff in all Ohio correctional institutions for COVID-19;

h. Waive all grievances during the COVID-19 pandemic;

i. Ensure adequate supplies of medications, including those currently subject to shortage, for the treatment of COVID-19 and the treatment of other underlying or routine medical conditions;

j. Provide medications upon request to inmates in need of those medications, which may be used more frequently during a COVID-19 infection;

k. Provide disposable protective face masks for all prisoners and corrections staff to prevent the spread of COVID-19 in the prisons;

l. Enjoin Defendants and their agents from retaliating against prisoners for reporting symptoms, or seeking redress administratively or from this Court;

m. Provide quarantine of persons who have come into contact with persons known to have COVID-19 or who are displaying symptoms of COVID-19 with medical checks without additional disciplinary characteristics of segregation;

n. Ensure COVID-19 positive correctional staff does not return to work without proof of COVID-19 negative status;

o. Any and all other remedies this Court see as necessary and just to address the constitutional violations set forth above in order to prevent long-term consequences and loss of life.

## **CONCLUSION**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

I.      For injunctive relief;

II.      For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

III.      Such other relief as the court deems just and proper

Respectfully submitted,

By: **/s/ Joseph C. Patituce**
Joseph C. Patituce (0081384)
Megan M. Patituce (0081064)
Kimberly Kendall Corral (0089866)
Patituce & Associates, LLC.
16855 Foltz Industrial Parkway
Strongsville, Ohio 44149
(440) 471-7784 (office)
(440) 398-0536 (fax)
attorney@patitucelaw.com