# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**ASHUNTE SMITH**, *et al.*,

          **Plaintiffs,**

    **v.**

**GOVERNOR OF OHIO
MIKE DEWINE**, *et al.*,

        **Defendants.**

    **Case No. 2:20-cv-2471**
    **JUDGE EDMUND A. SARGUS, JR.**
    **Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

The matters before the Court are: Defendant Ohio Department of Rehabilitation and Correction (the "ODRC") Director Annette Chambers-Smith's (the "Director") Motion to Dismiss (ECF No. 23); Defendant Governor of Ohio Mike DeWine's (the "Governor") Motion to Dismiss (ECF No. 26); and Plaintiffs' Ashunte Smith, Kaiquin Wang, Christopher Martin, and Travis Williams (collectively "Plaintiffs") Motion for a Preliminary Injunction (ECF No. 13). The parties have responded and replied to the motions and thus, they are ripe for review. For the following reasons, the Director's Motion to Dismiss (ECF No. 23) is **GRANTED in part** and **DENIED in part**, the Governor's Motion to Dismiss (ECF No. 26) is **GRANTED**, and Plaintiffs' Motion for a Preliminary Injunction (ECF No. 13) is **DENIED**.

## I. BACKGROUND

Plaintiffs, inmates at various Ohio prisons, filed this action on May 15, 2020 under 42 U.S.C. § 1983. (*See* Compl., ECF No. 1.) Plaintiffs sued the Director and the Governor in their capacities as having authority over the ODRC. (*See id.* ¶¶ 24–25.) The Court will begin with Plaintiffs' allegations, which for purposes of the motions to dismiss, are taken as true. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (noting that for purposes of a motion

to dismiss "the allegations in the complaint are accepted as true"). Next, the Court will relate the parties' evidence for purposes of the preliminary injunction.[1]

### 1. Plaintiffs' Allegations

Plaintiffs allege that in light of the Coronavirus pandemic the conditions in Ohio's prisons violate the Sixth and Eighth Amendments to the United States Constitution as well as Article I, Section 9 of the Ohio Constitution. (Compl. ¶¶ 68–83.) Plaintiffs sue on behalf of themselves and also seek to represent a class of "all prisoners who currently or will in the future be in custody of the ODRC and housed in an ODRC prison during the COVID-19 pandemic, the duration of which is yet unknown." (*Id.* ¶ 64.)

#### a. The Coronavirus Pandemic

The Coronavirus ("COVID-19") is a new upper respiratory virus that the World Health Organization ("WHO") has declared a global pandemic. (*Id.* ¶¶ 26–27.) COVID-19 spreads between individuals in close contact through respiratory droplets and possibly through touching an object containing the virus and then touching one's mouth, nose, or eyes. (*Id.* ¶ 26.) On March 9, 2020, the Governor acknowledged the presence of COVID-19 as a dangerous situation for the citizens of Ohio and declared a state of emergency. (*Id.*) In the following weeks the State of Ohio closed schools, polling stations, childcare facilities, adult daycare facilities, senior centers, restaurants and more, citing a significant risk of substantial harm due to the high probability of widespread exposure to COVID-19. (*Id.* ¶ 30.)

---

[1] Plaintiffs did not present any evidence with their motion for a preliminary injunction and instead waited until their reply in support of their motion for a preliminary injunction. Local Rule 7.2(d) provides that "all evidence then available shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence. Evidence used to support a reply memorandum shall be limited to that needed to rebut the positions argued in memoranda in opposition." S.D. Ohio Civ. R. 7.2(d). Additionally, "[a] party may not ordinarily raise an issue in a reply because the opposing party has no opportunity to respond to it." *Prim v. Jackson*, Nos. 2:14-cv-1219, 2:14-cv-2159, 2015 U.S. Dist. LEXIS 48970, at *23 (S.D. Ohio Apr. 14, 2015). Thus, Plaintiffs' evidence was provided improperly and should not be considered. As will be seen when the Court addresses the motion for a preliminary injunction, however, even if the Court considers this evidence, the motion is denied. *See infra* Section III.

The Ohio Department of Health ("ODH") has warned that certain individuals, for example the elderly, those with weakened immune systems, and those with chronic medical conditions, are at risk of significant harm if they contract COVID-19. (*Id.* ¶ 26.) In addition, gatherings of large numbers of people increase the risk of widespread transmission of COVID-19. (*Id.* ¶¶ 30, 45.) Thus, "[s]ocial [d]istancing [r]equirements include[] maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, cover[ing] coughs or sneezes (into the sleeve or elbow not hands), regularly cleaning high-touch surfaces, and not shaking hands." (*Id.* ¶ 31.)

There is currently no projected end to the COVID-19 pandemic and there is no vaccine or specific medication which can be used to treat or prevent the disease. (*Id.* ¶¶ 59–60.)

### b. COVID-19 and the ODRC

Plaintiffs allege that the ODRC "does not have the capacity to provide constitutionally adequate medical care for all prisoners who may contract COVID-19." (*Id.* ¶ 33.) Plaintiffs allege the ODRC's institutions do not have adequate in-house facilities or medical staff to screen inmates, do not have medical equipment to treat inmates, and are unable to transport high volumes of prisoners off-site for treatment. (*Id.*) The ODRC has two specialized medical facilities, but Plaintiffs allege these facilities do not have enough space or equipment to service large portions of the ODRC and are already facing a substantial outbreak of COVID-19. (*Id.* ¶ 34.) In addition to lacking the resources, Plaintiffs allege the ODRC's institutions are the ideal setting for the transmission of COVID-19. (*Id.* ¶¶ 37–38.) Once COVID-19 enters an institution "there is virtually no way to stop its progression." (*Id.* ¶ 39.) Plaintiffs allege that as of May 12, 2020, COVID-19 had entered all but four of the ODRC's institutions. (*Id.* ¶ 40.)

3

Plaintiffs also contend that "Ohio [] lacks the ability to institute broad testing among the incarcerated and civilian populations." (*Id.* ¶¶ 6, 43.) Plaintiffs allege the ODRC has implemented mass testing in three of its prisons and the results "demonstrate[d] [a] dangerous trend that is hurling out of control within Ohio's prisons." (*Id.* ¶ 44.) Plaintiffs contend that as of May 12, 2020, the ODRC reported that out of 7,536 tests given, 59% were positive. (*Id.* ¶ 4.) Further, 49 prisoners in the ODRC's custody have died as a result of COVID-19. (*Id.* ¶ 10.)

Plaintiffs contend that this is particularly concerning because the ODRC's institutions house many individuals in a high-risk category including those over the age of 50 or suffering from a chronic health condition making them more susceptible to severe illness from COVID-19. (*Id.* ¶¶ 47–53.) Plaintiffs contend the risk is increased further due to over-population and close living quarters within the prisons. (*Id.* ¶¶ 2, 54.)

Plaintiffs also allege issues with attorney visitation. Plaintiffs contend that in March of 2020, the ODRC suspended visitation including visits with attorneys. (*Id.* ¶ 56.) As of the date of the Complaint, Plaintiffs contend visitation is still suspended. (*Id.*) Each institution organizes how attorneys can communicate with their clients and Plaintiffs maintain some institutions have no means by which attorneys can communicate confidentially with their clients. (*Id.* ¶ 57.)

### c. **Plaintiffs**

This case has four named Plaintiffs. Plaintiff Smith has been an ODRC prisoner in Marion Correctional Institution ("MCI") since 1996 when he was arrested at the age of 17. (*Id.* ¶ 20.) Plaintiff Smith is eligible for parole but was denied release at his first hearing. (*Id.*) Plaintiff Smith is one of 2,147 prisoners at MCI who have contracted COVID-19. (*Id.*)

Plaintiff Wang has been a prisoner at Allen Correctional Institute ("ACI") since October 3, 2019. (*Id.* ¶ 21.) He is a first-time offender serving an eighteen-month sentence for a non-

violent drug offense. (*Id.*) He was eligible for judicial release, but the Wood County Court of Common Pleas denied his motion. (*Id.*) Plaintiff Wang has diabetes. (*Id.*)

Plaintiff Martin is serving a fourteen-month sentence in Richland Correctional Institution ("RCI"). (*Id.* ¶ 22.) Plaintiff Martin was convicted of domestic violence, a fourth-degree felony. (*Id.*) During his incarceration, Plaintiff Martin has been described as engaging in conduct which is "that of a leader" and has "taken responsibility for his actions and is working to better himself and those around him." (*Id.*)

Plaintiff Williams is a prisoner at MCI who has asthma and chronic pneumonia and has contracted COVID-19. (*Id.* ¶ 23.) Plaintiff Williams has been in ODRC custody since 2002. (*Id.*)

### d. Relief

Plaintiffs ask for release of certain categories of inmates and an order requiring the ODRC to provide specific COVID-19 prevention, testing, and care. (*Id.* ¶¶ 84–85.) Plaintiffs contend that release of prisoners will allow medically vulnerable inmates to self-quarantine in their homes and allow inmates who remain in prisons to practice social distancing. (*Id.* ¶ 14.)

### 2. Plaintiffs' Evidence

Plaintiffs provide declarations from family members of ODRC inmates, Plaintiffs Martin, Wang, and Smith's applications to the Governor for reprieve, affidavits from one attorney and two paralegals who represent or assist in the representation of inmates, and various other documents. (*See* Pls.' Resp. Mots. Dismiss & Reply Prelim. Inj., ECF No. 37.)

### a. Declarations

Plaintiffs provide declarations from Vicky Gaston, Mildred Gonzalez-Serota, Andrea Alexander, Karina Anne Brewington, Susan J. Rair Krug, and Wesley Park Jr., all friends or family of inmates imprisoned in an ODRC facility. (*See id.* at Ex. 1.) These declarants make various

allegations regarding the ODRC's facilities. (*See id.*) Many of these allegations relate to the ODRC's conditions since the COVID-19 pandemic began, such as: "[i]t is impossible for inmates to social distance," there is a "low morale and emotional health," there are a "[l]ack of sanitation/cleaning products," staff are seen "[t]ouching trays without gloves," "[d]rugs [a]re introduced in the facility," and inmates are being transferred into the facility despite the lockdown. (*See id.* at 1–2, 8, 10.) None of the declarants themselves are imprisoned. (*See id.*) Some declarants also provide information specific to the inmate they know. (*See id.* at 4.) One affiant averred that an inmate tested negative and his cellmate tested positive, but a week passed before the two were separated. (*See id.*) None of the declarants mentions any of the four Plaintiffs.

The declarants also provide allegations related to inmates' communication with their attorneys, such as: "[i]nmates are not able to meet with attorneys or speak on [an] unrecorded line," "[m]y [f]iancés['s] mail has been lost and returned," "[l]egal mail has been played with and not received at times," "[m]y daughter wanted to speak on the phone with her attorney [], but had to write her a letter," and "Jon has not been given private access to his attorney for 6 months." (*See id.* at 3, 7–8, 10, 13.) Again, the declarants do not mention any of the four Plaintiffs.

Finally, some of the allegations in the declarations relate to the ODRC's grievance procedure, such as: "[g]rievance forms have been thrown away," and "[w]e filed grievance after grievance [and] . . . [n]o one did anything." (*See id.* at 8, 16.)

### b. Applications for Reprieve

In addition to the declarations, Plaintiffs provide Plaintiff Wang, Plaintiff Smith, and Plaintiff Martin's application for reprieve. (*See id.* at Ex. 2.) The applications explain the Plaintiffs' sentences and behavior in prison and request release. (*See id.*)

### c. Affidavits

Plaintiffs provide three affidavits. First, that of Kimberly Kendall Corral, an attorney for Dewitt McDonald an inmate housed at RCI. (*See id.* at Ex. 6, ¶¶ 1–2.) Ms. Corral indicates she went to RCI to pick up medical records for Mr. McDonald and observed a staff member handing out masks. (*See id.* ¶¶ 4–5, 10.) Ms. Corral also observed a substantial number of correction officers entering and leaving without masks. (*See id.* ¶ 11.)

Next, Plaintiffs provide Suzanne McCort's affidavit. (*See id.* at Ex. 4.) Ms. McCort is a paralegal at Patituce & Associates, LLC, who spoke with the ODRC's legal department. (*See id.* ¶¶ 1–2.) Ms. McCort states she was informed that all attorney visitation had been canceled. (*See id.*) Ms. McCort also spoke to RCI's warden who stated RCI was not allowing in-person attorney visitation and could not provide a date when it would resume. (*See id.* at ¶ 3.)

Lastly, Plaintiffs provide Michelle N. Witchey's affidavit. (*See id.* at Ex. 5.) Ms. Witchey is a paralegal for Patituce & Associates, LLC. (*Id.* ¶ 1.) In late spring and early summer of 2020, Ms. Witchey received multiple email notices that her scheduled attorney-client visits at RCI were canceled. (*See id.* ¶¶ 18–19.) Ms. Witchey also spoke with individuals in April and May of 2020 who told her attorney visitation was canceled with no determined re-open date. (*Id.* ¶¶ 4, 10, 12, 15.) Additionally, Ms. Witchey states she was told no confidential calls could be arranged as inmates' calls were required to be on speaker with staff in the room with the inmate. (*Id.* at ¶ 17.) Finally, Ms. Witchey states she is "not aware of any attorney from [her] law firm being able to schedule a confidential attorney-client phone call or meeting with any of their clients located in the custody of [the] ODRC." (*Id.* ¶ 20.) Additionally, Ms. Witchey received calls on May 4, 7, and 22, 2020 stating that RCI had opened legal mail outside of an inmate's presence and once made copies of the paperwork. (*Id.* ¶ 5.)

7

### d. Other Documents

Finally, Plaintiffs submit a series of documents. (*See id.* at Ex. 3.) Plaintiffs do not provide an explanation of what the documents are. (*See id.*) The documents appear to be screenshots of the ODRC's social media posts regarding COVID-19 in prisons and inmates making face masks as well as an article titled *DeWine Bucks Parole Board, Grants Early Prison Release to Coingate Figure Tom Noe*. (*See id.*)

### 3. Defendants' Evidence

The Governor did not submit evidence in support of his response in opposition to Plaintiffs' motion for a preliminary injunction. (*See* Def. Ohio Governor Mike DeWine Combined Mot. Dismiss & Mem. Opp'n Mot. Prelim. Inj., ECF No. 26, hereinafter "Def. Governor Mot. Dismiss & Resp. Prelim. Inj.") The Director submitted evidence in the form of declarations and accompanying exhibits. (*See* Def. ODRC Director Annette Chambers-Smith's Resp. Opp'n Mot. Prelim. Inj., ECF No. 37, hereinafter "Def. Director Resp. Prelim. Inj.") The most relevant evidence is summarized here beginning with the Director's general actions to combat COVID-19 and then facts specific to reducing the prison population, COVID-19 testing, attorney visitation and legal mail, and the ODRC's grievance procedure.

### a. The ODRC's Response to COVID-19

The Director began planning the ODRC's COVID-19 response in early 2020, prior to any reported cases in the United States. (*Id.* at Ex. A, ¶ 8.) The ODRC formed a procedure to designate institutions as green, orange, or red based on the threat of COVID-19 being low as a result of no known infections inside or around the institution, medium based on infections in the local community and areas surrounding the institution, or high based on a single COVID-19 positive case in a staff member or inmate within the institution. (*Id.* ¶ 5.) In addition, during the early

months of the emerging pandemic the Director: participated in a Governor's Cabinet tabletop exercise regarding pandemic flu preparedness, addressed all wardens on preparation for COVID-19 to enter their facilities, held a tabletop exercise with the Adult Parole Authority regarding preparation, appointed a Commodities Task Force ("CTF") leader and instructed him to review the availability of personal protective equipment, ("PPE") and more. (*Id.* ¶¶ 8–12.)

In early March of 2020, the Director: provided each ODRC facility with 25 prevention education posters for inmate restrooms and instructions on obtaining more, ordered the CTF to gather mask inventory for all institutions to ensure they were being shared appropriately, ordered a review of chemicals the ODRC used to determine whether they met the Centers for Disease Control ("CDC") guidelines to combat COVID-19, provided relevant ODH and CDC messages to all facilities, permitted staff to carry hand-sanitizer, and more. (*Id.* ¶¶ 13–24.) Additionally, the Director began conducting daily conference calls with wardens and deputy directors. (*Id.* ¶ 27.)

On March 9, 2020, when the Governor declared a state of emergency, the Director took additional actions such as: waiving the co-pay for inmates requesting health services for flu or COVID-19 symptoms, ordering thermometers for all institutions to screen people entering the facility, putting in place processes for screening and isolating newly admitted inmates, and canceling group events or requiring them to be held remotely. (*Id.* ¶ 24.) The Director continued to take action throughout March including: providing PPE guidance to each institution, quarantining inmates who arrived with COVID-19 symptoms as well as those they had traveled with, ordering any municipal or county jail transferring an inmate to the ODRC to pre-screen for COVID-19 symptoms, preventing transferring any inmates who had tested positive for COVID-19, implementing policies to decrease contact among inmates, creating triage locations outside of medical facilities for those with respiratory illness symptoms, postponing non-essential medical

services, allowing inmates to make their own masks, continuously providing updated CDC and ODH guidance to wardens and staff members, and more.  (*See id.* ¶¶ 27–62.)

The Director continued to take additional measures to combat COVID-19 through April and May of 2020.  These actions included: ordering masks be first given to those the CDC considered at an increased risk, requiring staff and inmates to wear a face mask while moving throughout the facility, increasing sanitizing operations, dividing and distributing library materials among cohorts to reduce cross-contamination, ordering commissary to be delivered to housing units, dividing staff into cohorts and preventing staff from entering other cohorts, changing food service from three medium sized meals to two larger meals with the option to take food back to cells to minimize gatherings for meals, obtaining the Ohio State Highway Patrol and the Ohio National Guard to assist with staffing and security, and modifying existing policies to allow inmates to have certain products like disinfecting wipes.  (*Id.* ¶¶ 63–127.)

As of June 30, 2020, the Director and the ODRC continue to review and adopt CDC and ODH recommendations and test and track both inmates and staff for COVID-19.  (*Id.* ¶ 157.) Additionally, the Director implemented a "step down" process where each facility, at the direction of its warden, can begin to return to normal in accordance with a plan each warden develops in consultation with the regional director and regional nurse administrator.  (*Id.*)

### b.  Reduction of the ODRC's Population

On March 9, 2020, when the Governor declared a state of emergency, there were 48,727 adults incarcerated in an ODRC institution.  (*Id.* ¶ 3.)  As of June 30, 2020, there were 45,910 adults incarcerated in an ODRC institution.  (*Id.*)  The Director states the population decrease is a "direct result of the ODRC's efforts in multiple areas, and the efforts of the jails and the judiciary" including: reducing new commitments; screening pregnant, post-partum, and women with children

and requesting the court consider judicial release; screening inmates over 60, within 120 days of release, and with one chronic condition and requesting the court consider release options; reducing the sentences of certain inmates by 90 days under Ohio Revised Code § 2967.18; screening inmates over 60 who had served 50% of their time and referring them to the Governor's office for expedited clemency consideration; reviewing parole-board eligible inmates who received a continuance, served 50% of the continuance, and are 60 years old or older and providing special parole hearings; temporarily altering the criteria used to incarcerate individuals who commit parole or post release violations to focus on those directly related to sexual misconduct, violence, or weapons; reviewing inmates under the age of 60 with a condition that makes them suspectable to serious illness from COVID-19 and who have served at least 50% of their time and referring them to expedited clemency consideration; working with the Public Defender's Office to identify candidates for judicial release and expediting the process whereby a court can get summary reports; individually reviewing all early release requests against the aforementioned criteria; utilizing early release options such as treatment transfer and transitional control; and expanding online education options enabling inmates to earn up to 90 days credit.  (*See id.*)

### c.  The ODRC's COVID-19 Testing

On April 3, 2020, the first ODRC inmate tested positive for COVID-19 at the Toledo Correctional Institution.  The institution was placed on red status.  (*Id.* ¶ 68.)  On April 11, 2020, mass testing of both inmates and staff began in three facilities.  (*Id.* ¶ 87.)  MCI was the first facility to undergo mass testing because the number of positive test results had slowly climbed after a staff member tested positive and the facility housed a high percentage of inmates with chronic diseases. (*Id.*)  Next, the ODRC mass tested Pickaway Correctional Institution because it has a health center that accommodates those requiring long term care.  (*Id.*)  Finally, the ODRC mass tested Franklin

Medical Center because it has a hospice center.  (*See id.*)  This mass testing indicated a high percentage of inmates with COVID-19, of which a very high percentage were asymptomatic.  (*Id.*)

As of June 23, 2020, the ODRC had tested 13,197 inmates for COVID-19.  (*Id.* ¶ 155.)  Of these tested inmates 8,115 tested negative, 4,944 tested positive, 138 tests were pending.  (*Id.*) As of the same date 76 inmates had died of COVID-19.  (*Id.*)  As of June 30, 2020, the ODRC had tested over 14,000 inmates for COVID-19 and published the results online.  (*Id.* ¶ 6.)

Bradley Eller, a registered nurse for the ODRC, indicated that Plaintiff Smith and Plaintiff Williams were tested on April 16, 2020, as a part of mass testing, and both men tested positive. (*Id.* at Ex. C, ¶ 6.)  Both men were asymptomatic and recovered.  (*See id.*)  Plaintiff Wang has not been tested and has no symptoms.  (*Id.* ¶ 11.)  Similarly, Plaintiff Martin has not been tested nor has he made any complaints of symptoms.  (*Id.* ¶ 12.)

### d.  COVID-19 and Attorney Visitation and Mail

The ODRC has an administrative policy, promulgated by the Director, that attorneys may visit during regular visiting hours and may request a visit on weekends or after regular visiting-hours with at least one-day advance notice.  (*Id.* at Ex. A, ¶ 7.)  On March 10, 2020, the Director suspended visiting at ODCR facilities effective March 11, 2020, "to protect the incarcerated population from the possible spread of COVID-19 entering facilities through asymptomatic members of the general public."  (*Id.*)  "Only staff members, essential contractors, and attorneys were permitted to visit inmates."  (*Id.*)  The Director distributed documents and videos to staff and inmates to explain the new restrictions.  (*Id.*)  The Director also posted information online to inform the public of the new policy.  (*Id.*)  The online information encouraged attorney visitation through phone or by video.  (*Id.*)

On April 16, 2020, the Director held a call with the wardens to remind them that they must have a way for attorneys to visit their clients and communicate confidentially.  (*Id.* ¶ 99.)  Rossi Azmoun, the administrative assistant for Ed Sheldon, RCI warden, testified that "[t]he Director was very clear that the directive to restrict visitation did not include attorneys, and that [the facilities] were to accommodate requests from attorneys seeking to meet with their clients in person."  (*Id.* at Ex. D, ¶ 8.)  Mr. Azmoun also testified that RCI has protocols in place to accommodate in-person visits between inmates and legal counsel including masks, hand sanitizer, and social distancing.  (*Id.* ¶ 9.)  Additionally, telephone calls and video conferencing are available.  (*Id.*)  ODRC policy generally requires recording phone calls but Mr. Azmoun testified that exceptions can be made to protect privileged conversations.  (*Id.* ¶ 10.)  Mr. Azmoun also stated he has never denied an attorney access to a client, and he had confirmed that the secretaries in the warden's office had never done so either.  (*Id.* ¶ 13.)

Audrie Bender and Michelle Dunkle, administrative assistants to the MCI warden, Christine Borkosky and Katherine Hamilton, secretaries to the MCI warden, and Joanna Factor, administrative assistant to the ACI warden, all testified to similar facts at their respective institutions.  (*See id.* at Exs. E–I.)  In addition, Ms. Dunkle stated that Plaintiff Smith's counsel requested a confidential call with Plaintiff Smith on June 4, 2020 at 10:30AM.  (*Id.* at Ex. G, ¶ 17.)  The request was accommodated, and Plaintiff Smith and his counsel communicated over the phone on June 4, 2020, at 10:35AM.  (*Id.*)

The ODRC also has a policy that "[m]ail addressed to an inmate clearly bearing the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the Correctional Institution Inspection Committee," is considered legal mail.  (*Id.* at Ex. A, ¶ 7.)  Legal mail, "may be opened and inspected for contraband only in the presence of the inmate-

addressee." (*Id.*)  The secretaries and administrative assistants declared they had no record of inmates complaining about staff opening their mail.  (*See id.* at Exs. D–I.)

### e.  The ODRC's Inmate Grievance Procedure

The ODRC maintains an inmate grievance procedure available to all inmates regardless of their disciplinary status.  (*Id.* at Ex. B, ¶ 4.)  "This procedure allows inmates to seek relief regarding any aspect of institutional life that directly and personally affects the grievant."  (*Id.*)  In order to properly exhaust all administrative remedies "an inmate must properly and successfully complete all three steps within the time frames allotted in compliance with other rules and regulations pursuant Ohio Administrative Code § 5120-9-31."  (*Id.*)  "Even during the height of the current COVID-19 pandemic, [the] ODCR's grievance process was available to all inmates, at all institutions, in the normal course of business without delay."  (*Id.* ¶ 11.)

The ODRC's Assistant Chief Inspector Kelly Reihle, who handles inmates' appeals to the Chief Inspectors Office, contends that none of the four Plaintiffs have submitted any complaints to begin the grievance process.  (*Id.* ¶¶ 12–15.)

## II. DEFENDANTS' MOTIONS TO DISMISS

### 1.  Legal Standard

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and under 12(b)(6) for failure to state a claim.

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the court lacks subject matter jurisdiction.  Without subject matter jurisdiction, a federal court lacks authority to hear a case.  *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990).  Under the Eleventh Amendment, federal courts lack jurisdiction to hear suits by private citizens against a State unless the State consents to the suit or unless Congress, pursuant to a valid exercise of power,

indisputably consents its intent to abrogate state immunity." *Bedford v. Kasich*, No. 2:11-cv-351, 2011 U.S. Dist. LEXIS 51903, at *19 (S.D. Ohio May 4, 2011) (citing *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *Smith v. Ohio Legal Rights Serv.*, No. 2:10-cv-1124, 2011 U.S. Dist. LEXIS 46024, at *15 (S.D. Ohio Apr. 29, 2011).

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." To meet this standard, the complaint must allege facts sufficient to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the non-moving party, accepting as true all of plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Nonetheless, the Court must read Rule 12(b)(6) in conjunction with Federal Rule of Civil Procedure 8(a), requiring a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 907 (S.D. Ohio 2013). Thus, a pleading's factual allegations, assumed to be true, must do more than create mere speculation of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Further, "the tenet that courts must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 662. As such, while a plaintiff is not required to set forth detailed factual allegations at the pleading stage, a complaint must contain a basis upon which relief can be granted; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *See id.* at 679; Fed. R. Civ. P. 8(a).

2. **Analysis**

The Governor and the Director both argue that certain claims against them should be dismissed because of the Eleventh Amendment, the entire case should be dismissed because Plaintiffs failed to exhaust their administrative requirements under the Prisoner Litigation Reform Act ("PLRA") and Plaintiffs failed to state a claim for relief.

a. **Eleventh Amendment Immunity**

"An entity acting as an arm of the state enjoys Eleventh Amendment immunity from federal suit to the same extent as the state itself." *Yancey v. Los Angeles Superior Court*, No. 5:03-cv-122, 2004 U.S. Dist. LEXIS 330, at *10 (W.D. Mich. Jan. 2, 2004) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47–51 (1994)); S*mith*, 2011 U.S. Dist. LEXIS 46024 at *15 (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978)).  Thus, Eleventh Amendment immunity extends to state officials sued in their official capacity. *McCormick v. Miami Univ.*, No. 1:10-cv-345, 2011 U.S. Dist. LEXIS 48467, at *57 (S.D. Ohio May 5, 2011) (citing *Turker v. Ohio Dep't Rehab. & Corr.*, 157 F.3d 453, 457 (6th Cir. 1998)).  This is because a suit against a state official in his official capacity is not a suit against the official but rather a suit against the official's office and as such is no different than a suit against the state itself.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Eleventh Amendment immunity for state officials is limited, however, by the doctrine of *Ex Parte Young*, which the Supreme Court has described as applying "when a federal court commands a state official to do nothing more than from refrain from violating federal law."  *See Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 248 (2011).  In these instances, courts apply a "legal fiction" that the state official is not the state for sovereign immunity purposes.  *See id.*  As a result, when a state official is sued only for prospective non-monetary relief, such as an

injunction, for a violation of federal law, Eleventh Amendment immunity does not apply. *See Ex Parte Young*, 209 U.S. 123, 15–60 (1908); *Smith v. Oakland Cnty.*, 344 F. Supp. 2d 1030, 1056 (E.D. Mich. 2004). Importantly, however, this doctrine does not apply to a state official's violation of state law, to which Eleventh Amendment immunity applies. *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Ohioans Against Corp. Bailouts, LLC v. LaRose*, 417 F. Supp. 3d 962, 975–76 (S.D. Ohio Oct. 23, 2019) ("A claim that a state official violates state law in carrying out his or her official duties is a claim against the state, which is barred by the Eleventh Amendment, depriving a federal court of jurisdiction to hear the matter."); *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005) (en banc) ("[T]he states' constitutional immunity from suit prohibits *all* state-law claims filed against a [s]tate in federal court, whether those claims are monetary or injunctive in nature."). "This conclusion applies even if . . . supplemental jurisdiction otherwise exists." *Otte v. Kasich*, 709 F. App'x 779, 782 (6th Cir. 2017) (citing *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000)).

First, both Defendants argue that Plaintiffs' state law claim must be dismissed because they have Eleventh Amendment immunity.[2] (Def. Director Mot. Dismiss at 12–14, ECF No. 23; Def. Governor Mot. Dismiss & Resp. Prelim. Inj. at 7–8.) Plaintiffs argue the claim is not barred by the Eleventh amendment because they seek prospective injunctive relief, not monetary relief. (Pls.' Resp. Mots. Dismiss & Reply Prelim. Inj. at 3–4.) Defendants argument is well-taken.

Plaintiffs' claim against Defendants in their official capacities for a violation of the Ohio Constitution is essentially a suit against the state of Ohio itself. *See Will*, 491 U.S. at 71; *see also Hargrove v. Holley*, No. 1:17-cv-560, 2017 U.S. Dist. LEXIS 180284, at *8–9 (S.D. Ohio Oct. 31,

---

[2] Plaintiffs did not explicitly state whether they were suing Defendants in their individual or official capacities and thus, the Court presumes they are being sued in their official capacities. *See Soper by Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999) ("[P]laintiffs must designated in which capacity they are suing defendants; if not, by operation of law, defendants are deemed sued in their official capacities.").

2017) (finding claim against Ohio Governor Kasich a claim against Ohio); *Yates v. Kasich*, No. 4:12cv1551, 2012 U.S. Dist. LEXIS 159891, at \*9 (N.D. Ohio Nov. 7, 2012) (finding the same); *Garcia v. Lorain Cnty. Court of Common Pleas*, No. 1:18-cv-944, 2019 U.S Dist. LEXIS 67179, at \*10–11 (N.D. Ohio Apr. 19, 2019) (finding the claim against the ODRC Director Mohr a claim against the state). The State of Ohio has immunity for all claims against it because Ohio has not consented to suits in federal court nor has Congress abrogated Ohio's immunity under § 1983. *See Ohio v. Madeline Marie Nursing Homes # 1 & # 2*, 694 F.3d 449, 460 (6th Cir. 1984); *Giles v. Univ. of Toledo*, 478 F. Supp. 2d 924, 960–61 (N.D. Ohio 2007) (noting Congress did not abrogate the states' immunity in enacting Section 1983 (citing *Will*, 491 U.S. at 71)). Contrary to Plaintiffs' argument, the doctrine of *Ex Parte Young* does not apply because the alleged violation is one of state law. *See Ohioans Against Corporate Bailouts*, 417 F. Supp. 3d at 975–76. Thus, the claim alleging a violation of state law is **DISMISSED**.

In addition to arguing the Eleventh Amendment provides immunity from the state law claim, the Governor argues the remaining federal claims against him are also barred because he had no part in the actions Plaintiffs allege are unconstitutional. (*See* Def. Governor Mot. Dismiss & Resp. Prelim. Inj. at 8–11.)

"Under *Ex Parte Young*, a federal court can issue prospective relief compelling a state official to comply with federal law because 'it is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.'" *Ball v. Kasich*, 244 F. Supp. 3d 662, 673 (S.D. Ohio 2017) (citing *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008)). "For the exception to apply, however, the officer named in the suit must have 'some connection with the enforcement of the act.'" *Id.* (citing *Ex parte Young*, 209 U.S. at 157); *see also Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("Young does

not reach state officials who lack a 'special relation to the particular statute' and '[are] not expressly directed to see to its enforcement.'" (quoting *Ex parte Young*, 209 U.S. at 157)). "In other words, '[t]he state official sued [] must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains.'" *Id.* (citing *Floyd v. Cnty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012)); *see also Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996) ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." (citations omitted)). Absent such connection, "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Id.* (citing *Russell*, 784 F.3d 1048).

Importantly, courts have not read *Young* expansively. *Children's Healthcare*, 92 F.3d at 1415 (citing *Pennhurst State*, 465 U.S. at 104). "Generally, a state executive's role in appointing and supervising officials, setting policy, and making budget recommendations fail to meet the sufficient connection requirement under *Young*." *Ball*, 244 F. Supp. 3d at 673; *see e.g.*, *Hendricks v. Kasich*, No. 2:12-cv-729, 2013 U.S. Dist. LEXIS 71991, at *9 (S.D. Ohio May 21, 2013) (finding the Governor's executive and budget authority not sufficient to show responsibility for enforcement of any law or policy relating to the claim).

The Governor states:

> Plaintiffs have failed to allege that the Governor has any enforcement authority over the ODRC['s] policies and procedures that they allege are unconstitutional. Rather, they are suing him because he is "the Governor of the State of Ohio and, as such, is the ultimate executive authority over [the] ODRC." This is entirely insufficient to trigger *Ex Parte Young*.

(Def. Governor Mot. Dismiss & Resp. Prelim. Inj. at 11 (quoting Compl. ¶ 24; citing *see Children's Healthcare*, 92 F.3d at 1416; *Ball*, 244 F. Supp. 3d at 675).) Additionally, the Governor

argues that "Plaintiffs do not claim that the Governor did anything, much less that he had any hand in [the] ODRC's response to COVID-19.  Rather, their Complaint is replete with references to the actions of [the] 'ODRC' and 'the State.'"  (*Id.* at 12 (citing *see e.g.,* Compl. at ¶ 56).)

In response, Plaintiffs contend that the Complaint "articulates and advances the allegations that the Governor is actively involved in the decision-making process that involved [the] ODRC." (Pls.' Resp. Mots. Dismiss & Reply Prelim. Inj. at 4.)  In support of this statement Plaintiffs state:

> The Governor has the authority to release prisoners from unconstitutionally dangerous conditions in violation of the 8th Amendment.  The Governor has also gradually changed his position that he would not release any inmates to releasing some for health and safety reasons, even if their crimes were outrageous and their release not supported by the parole board.
>
> Here, the Governor has repeatedly referenced his work with [the] ODRC to control the conditions in the prison system.  The Governor has repeatedly referenced his orders on prison visitation.  The Governor's relation to the constitutional and federal violations complained of, both that have already happened and will continue to happen, is more than merely his title, and as such, his motion to dismiss should fail.

(*Id.* at 14–15.)

Importantly, however, in support of these statements Plaintiffs do not cite to their Complaint.  Instead they cite to the Governor's Twitter account, the Ohio Channel, and a news article.  (*See id.*)  These sources were not attached to or incorporated into the Complaint and thus, for purposes of the motion to dismiss the Court cannot consider them.[3]  *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (noting that in ruling on a motion to dismiss the Court can only consider "allegations in the complaint," "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." (citation omitted)); *Trs. of Detroit*

---

[3] A defendant may bring a motion to dismiss under Rule 12(b)(1) as a facial attack or a factual attack.  *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  For purposes of their Eleventh Amendment argument, Defendants do not contest the facts laid out in the Complaint, and thus, they bring a facial attack.  *See Ball*, 244 F. Supp. 3d at 671–72.  "[A] facial attack on the pleading under Rule 12(b)(1) mirrors the standard of review on a motion brought under Rule 12(b)(6)," and thus requires the Court to look only to the Complaint.  *See id.* at 672.

*Carpenters Fringe Benefit Funds v. Patrie Constr., Co.*, 618 F. App'x 246, 255 (6th Cir. 2015) ("In considering a Rule 12(b)(6) motion, a district court cannot consider matters beyond the complaint."); *Rondigo*, 641 F.3d at 680 ("Assessment of the facial sufficiency of the complaint must ordinarily be undertaken without resort to the matters outside of the pleadings.").

Looking at the Complaint, Plaintiffs have failed to allege the Governor has any specific connection to the actions which they contend are unconstitutional.  Plaintiffs' general statements that the Governor has "ultimate executive authority" and the "supreme executive power" are insufficient.  (Compl. ¶ 24.)  This Court, and others, have already found such general supervisory powers insufficient to subject a state official to suit.  *See e.g.*, *Ball*, 244 F. Supp. 3d at 673 (finding Governor Kasich's powers to see that the laws are executed, directing, supervising, controlling, and setting state policy, and having ultimate budgetary power insufficient to state a claim); *Hendricks*, 2013 U.S. Dist. LEXIS 71991 at *9 (finding Governor Kasich's executive and budget authority not sufficient to show responsibility for enforcement of any law or policy relating to the claim); *Peter B. v. Sanford*, No. 6:10-767, 2012 U.S. Dist. LEXIS 81500, at *17–18 (D.S.C. June 13, 2012) (finding general authority over the state Medicaid program insufficient to waive the governor's immunity).  Plaintiffs have not alleged the Governor ordered any of the actions taken to respond to COVID-19 which they claim are unconstitutional.  While the Governor may direct broad policy initiatives to various state agencies such as the ODRC, those agencies retain responsibility for direct enforcement of those policies.

Plaintiffs have failed to plead the Governor's responsibility for the direct enforcement over the ODRC's policies beyond his general executive authority.  This Court has previously noted that "[w]ere the law otherwise, the [*Young*] exception would always apply, Governors who influence state executive branch policies (which virtually all governors do) would always be subject to suit

under *Ex Parte Young*.  The exception would become the rule." *Ball*, 244 F. Supp. 3d at 674 (citing *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015)).  Thus, the *Ex parte Young* exception does not apply, and the Governor has Eleventh Amendment immunity for all remaining claims against him.  All claims against the Governor are **DISMISSED**.

### b.  The PLRA's Exhaustion Requirement

"Under 42 U.S.C. § 1997e(a), as amended by the PLRA, 'a prisoner confined in any jail, prison, or other correctional facility' may not bring an action challenging 'prison conditions' under 42 U.S.C. § 1983 'or any other [f]ederal law . . . until such administrative remedies as available are exhausted.'"  *Ball v. Ohio*, No. 2:20-cv-1759, 2020 U.S. Dist. LEXIS 71701, at *6 (S.D. Ohio Apr. 23, 2020) (quoting 42 U.S.C. § 1997e(a)).  "This mandatory exhaustion requirement applies to all lawsuits relating to prison conditions, regardless of the nature of the wrong or the relief sought."  *Id.* (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).  "'Exhaustion under the PLRA means 'proper exhaustion.'"  *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)).  "To properly exhaust, prisoners must 'tak[e] advantage of each step the prison holds out for resolving the claim internally and . . . follow the critical procedural rules of the prisons' grievance process to permit prison officials to review and, if necessary, correct the grievance on the merits in the first instance.'"  *Id.* at *6–7 (quoting *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (internal citations omitted)).

"The purpose of the exhaustion requirement 'is to allow prison officials a fair opportunity to address grievances on the merits, to correct prison errors that can and should be corrected, and to create an administrative record for those disputes that eventually end up in court.'"  *Id.* at *7 (quoting *Mattox v. Edelman*, 851 F.3d 583, 591 (6th Cir. 2017) (internal citations omitted)).

This Court recently described Ohio's procedure for resolving inmate complaints:

Ohio has established a procedure for resolving inmate complaints. Ohio Admin. Code § 5120-9-31. To properly exhaust a claim seeking relief "regarding any aspect of institutional life that directly and personally affects the [inmate]," an inmate at an ODRC facility must comply with its three-step grievance system. *Id.* For the first step, the inmate must submit an informal complaint to the staff member or to the direct supervisor of the staff member or to the department most directly responsible over the subject matter with which the inmate is concerned. *Id.* § 5120-9-31(K)(1). If the inmate is not satisfied with the results at the first step, he may take the second step by filing a formal grievance with the inspector of institutional services at the prison where he is confined. *Id.* § 5120-9-31(K)(2). That inspector will investigate the matter and issue a written response to the inmate's grievance within fourteen calendar days of receipt. *Id.* If the inmate is still dissatisfied, he may pursue the third step, which is an appeal to the office of the Chief Inspector of [the] ODRC. *Id.* § 5120-9-31(K)(3). An inmate does not exhaust his remedies under § 5120-9-31 until he has received a decision in an appeal to the office of the Chief Inspector. *Younker v. Ohio State Univ. Med. Ctr.*, No. 2:11-cv-00749, 2013 U.S. Dist. LEXIS 88963, at *4 (S.D. Ohio June 25, 2013).

*Id.* at *7–8.

"While this exhaustion requirement is an affirmative defense, '[a] complaint is subject to dismissal for failure to state claim if the allegations, taken as true, . . . show that relief is barred by an affirmative defense.'" *Id.* (citing *Mattox*, 851 F.3d at 590).

The Director argues that the Complaint must be dismissed in its entirety because Plaintiffs failed to exhaust their administrative remedies. (*See* Def. Director Mot. Dismiss at 6–7; Def. Director Reply Mot. Dismiss at 5–6, ECF No. 39.) Plaintiffs' Complaint asks the Court to "[w]aive all grievances during the COVID-19 pandemic." (Compl. ¶ 85(h).) Additionally, in their response to Defendants' motions to dismiss, Plaintiffs contend that they are not required to exhaust their administrative relief "because relevant administrative procedure lacks authority to provide any relief" and thus, attempting to work through the grievance process "would be nothing but a dead end." (Pls.' Resp. Mots. Dismiss & Reply Prelim. Inj. at 6–7.)

In *Ross v. Blake*, the Supreme Court held that, as is clear from the language of the statute, the exhaustion requirement in the PLRA is mandatory and forecloses judicial discretion. 136 S. Ct.

1850, 1857 (2016).  The Supreme Court also observed, however, that the PLRA contains its own

"textual exception to mandatory exhaustion."  *Id.* at 1858.  "[T]he exhaustion requirement hinges

on the 'availab[ility]' of administrative remedies: an inmate, that is, must exhaust available

remedies, but need not exhaust unavailable ones."  *Id.* (quoting 42 U.S.C. § 1997e(a)).  The

Supreme Court went on to note that there are "three kinds of circumstances in which an

administrative remedy, although official on the books, is not capable of use to obtain relief."  *Id.*

at 1859.  The first circumstance, the one which is relevant here, is when "an administrative

procedure is unavailable when (despite regulations or guidance materials may promise) it operates

as a simple dead end—with officers unable or consistently unwilling to provide any relief to

aggrieved inmates."  *Id.*

Plaintiffs, relying on *Ross*, argue the ODRC's grievance process is a dead end and thus

they were not required to attempt to exhaust their administrative remedies.  (Pls' Resp. Mots.

Dismiss & Reply Prelim. Inj. at 6–7.)  In light of the COVID-19 pandemic, federal courts are split

on the issue of whether administrative remedies are currently available to prisoners.  Some courts

have considered the irreparable harm and time-sensitive nature prisoners face in light of the virus

and find grievance procedures unavailable and thus, exhaustion not required.  *See e.g, Sowell v.*

*TDCJ*, No. H-20-1492, 2020 U.S. Dist. LEXIS 77809, at *7 (S.D. Tex. May 4, 2020) ("Where the

circumstances present an imminent danger to an inmate, TDCJ's time-consuming administrative

procedure, which TDCJ may choose to extend at will, presents no 'possibility of some relief.'"

(citing *Ross*, 136 S. Ct. at 1859)); *United States v. Vence-Small*, No. 3:18-cr-00031, 2020 U.S.

Dist. LEXIS 69354, at *12–13 (D. Conn. Apr. 20, 2020) ("In light of these emergency

circumstances, some judges have [waived exhaustion requirements,]" (citing *United States v.*

24

*Russo*, No. 16-cr-441, 2020 U.S. Dist. LEXIS 65390, at *6 (S.D.N.Y. Apr. 14, 2020) and *United States v. Haney*, No. 19-cr-541, 2020 U.S. Dist. LEXIS 63971, at *4 (S.D.N.Y. Apr. 13, 2020)).

Other courts have found that COVID-19 does not inherently render grievance procedures unavailable. *See Ball*, 2020 U.S. Dist. LEXIS 71701 at *4 ("[P]laintiff failed to properly exhaust his administrative remedies before seeking judicial relief . . . . [T]he exhaustion requirements of the PLRA are mandatory and may not be altered for special circumstances." (citing *Ross*, 136 S. Ct. at 1856–57)); *Nellson v. Barnhart*, No. 1:20-cv-21457-KMW, 2020 U.S. Dist. LEXIS 66971, at *13 (D. Colo. Apr. 16, 2020) ("The Court finds that plaintiff has failed to exhaust his administrative remedies before seeking judicial relief . . . . [T]he Court may not alter the mandatory requirements of the PLRA for COVID-19 or any other special circumstance." (citing *Ross*, 136 S. Ct. at 1856–57)).

On May 14, 2020, Justice Sotomayor provided additional guidance on this matter. Although the Supreme Court denied a plaintiff's application to vacate the Fifth Circuit's stay of a district court's preliminary injunction, Justice Sotomayor, joined by Justice Ginsburg, took issue with the Fifth Circuit's rejection of the possibility that the grievance procedure could ever be a 'dead end' even if they could not provide relief before an inmate faced a serious risk of death. *Valentine v. Collier*, 140 S. Ct. 1598, 1600 (2020). Justice Sotomayor stated that "if a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like C[OVID]-19, the procedures may be unavailable to meet the plaintiff's purposes, much in the way they would be if prison officials ignored the grievances entirely." *Id.* at 1600–01. Justice Sotomayor concluded that she "caution[s] that in these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance

25

process cannot or does not answer, the PLRA's textual exception could open the courthouse doors where they would otherwise stay closed." *Id.* at 1601.

Importantly, the Supreme Court held that "inmates are not required to specifically plead or demonstrate exhaustion in their complaints" because it is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). It is Defendants' burden to show that Plaintiffs failed to exhaust. *See id.* at 218. The Director does not directly address Plaintiffs' contention in their response that exhaustion is a dead end and thus, unavailable and instead simply argues that exhaustion is absolutely mandatory in all circumstances. (*See* Def. Director Reply Mot Dismiss at 5–6.) In light of the conflicting case law regarding the exhaustion requirement in this unprecedented pandemic the Court does not believe the Director has upheld her burden of showing that Plaintiffs failed to exhaust their administrative remedies and that doing so would not be a dead end in light of the pandemic. *See e.g.*, *McPherson v. Lamont*, No. 3:20cv534, 2020 U.S. Dist. LEXIS 79620, at * (D. Conn. May 6, 2020) (finding exhaustion in the state system waived "in light of the extraordinary circumstances presented by the COVID-19 pandemic"). Thus, at this stage and in the absence of a developed record, the claims will not be dismissed on the grounds that Plaintiffs failed to exhaust their administrative remedies.

### c. Failure to State a Claim

The Director argues that Plaintiffs' Complaint fails to state that medical care or an attorney were denied to any Plaintiff and instead speaks in generalities about the overall prison system and thus, the Complaint lacks the specificity *Twombly* and *Iqbal* require. (Def. Director Mot. Dismiss at 4–5.) Additionally, the Director contends Plaintiffs failed to state a claim under the Eighth Amendment because they fail to allege that the Director made a subjective decision to disregard the risks of COVID-19. (*Id.* at 7–12.) Further, the Director contends she does not have the

26

authority to unilaterally release inmates. (*See id.*) Finally, the Director contends Plaintiffs failed to state a clam for relief under the Sixth Amendment because they have not plead the Sixth Amendment applies to them. (*See id.*)

Looking at the face of the Complaint, the Court finds the Complaint states a claim for relief. The Director is correct that in order to prove a claim under the Eighth Amendment Plaintiffs must show the Director acted with deliberate indifference. *See infra* Section III.3.b.i. To show deliberate indifference, the Complaint must allege the Director was both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists and must also draw such inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Complaint explains the gravity of the reach of COVID-19 from which the inference can be drawn the Director had knowledge of the disease. (*See* Compl. ¶¶ 26–33); *Trs. of Detroit Carpenters*, 618 F. App'x at 252 (noting that courts have interpreted "*Twombly* to require complaints to contain either direct of inferential allegations respecting all material elements to sustain a recovery under some viable legal theory" (internal citation omitted)). Next, the Complaint contains facts that if true, could lead to the inference that the Director acted with a reckless disregard for the prisoners' safety. For example, the Complaint states the ODRC does not have adequate medical equipment or staff. (*Id.* ¶ 33.) The Complaint also states the ODRC's prisons are overpopulated and highly susceptible to COVID-19's spread. (*Id.* ¶ 54.) These facts state a claim from which a fact finder may infer that the ODRC has been deliberately indifferent to the needs of the prisoners during this pandemic. Importantly, the Complaint alleges these facts by stating "the ODRC" took or failed to take certain actions. (*See id.*) The Director is sued in her official capacity as the Director of the ODRC, and thus these statements state a claim that the Director, in her official capacity, violated the Eighth Amendment.

27

To state a claim under the Sixth Amendment, the Complaint must allege Plaintiffs' judicial process has been initiated and they were denied the assistance of counsel in such judicial process. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  The Complaint states some institutions have no means by which attorneys can communicate confidentially with their clients.  (*See* Compl. ¶ 57.)  Additionally, the Complaint states Plaintiffs do not have the assistance of counsel for their "defense[s]."  (*Id.* ¶ 78.)  Thus, the inference can be made that Plaintiffs are attempting to put forth a defense to a criminal proceeding and are not able to access counsel to do so.  This states a claim under the Sixth Amendment.

In sum, the Complaint does lack detail and speaks at times in generalities.  The Complaint does contain enough, however, for it to pass the 12(b)(6) standard and allow the Court to move to whether a preliminary injunction should be granted on the two remaining claims against the Director alleging ongoing violations of federal law.

### III. PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

#### 1.  Legal Standard

Rule 65 of the Federal Rules of Civil Procedure provides for injunctive relief when a party believes it will suffer immediate and irreparable injury, loss, or damage.  Still, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to issue a preliminary injunction, the Court must examine four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would

be served by issuing the injunction. *Id.* (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)); *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir.1997) (en banc). These considerations are factors which a court must balance, not prerequisites that must be met. *Id.* (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998)).

Additionally, the PLRA imposes restrictions on the Court's ability to grant injunctive relief. Any such relief must be (1) "narrowly drawn," (2) "extend no further than necessary to correct the harm the court finds requires preliminary relief," and (3) "be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). Importantly, courts must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity." *Id* Preliminary relief relating to prison conditions "shall automatically expire on the date that is 90 days after its entry, unless the court makes findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.*

## 2. Discussion

Plaintiffs argue that Defendants' response to the COVID-19 pandemic violates their Eighth and Sixth Amendment rights and ask the Court to:

> (1) prohibit Defendants from denying [] Plaintiffs right to the attorney-client privilege in a manner that is safe and confidential; (2) prohibit Defendants from withholding disinfectant from Plaintiffs; (3) prohibit Defendants from withholding medication and medical screening[s] from Plaintiffs; (4) prohibit Defendants from violating safe distancing guidelines; (5) prohibit Defendants from denying Plaintiffs' access to personal protective equipment; (6) prohibit Defendants from leaving sick prisoners in close proximity to Plaintiffs; and (7) prohibit Defendants from refusing to inspect, monitor, or care for the health of Plaintiffs.

(Pls.' Mot. Prelim. Inj. at 1, ECF No. 13.)

In response, the Director argues the motion should be denied because Plaintiffs have not satisfied the required elements for a preliminary injunction.[4]

### a.  Threshold issues

The Court will address the lack of evidentiary hearing and a three-judge panel according to the PLRA before moving to the merits of the motion.

### i.  Lack of Evidentiary Hearing

"Federal Rule of Civil Procedure 65, which governs the issuance of preliminary injunctions, does not explicitly require the court to conduct an evidentiary hearing, but it does direct that '[n]o preliminary injunction shall be issued without notice to the adverse party.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(a)(1)).  The Sixth Circuit has indicated "a hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law." *Id.* (citing *Lexington-Fayette Urban Cnty. Gov't v. Bellsouth Telecomm., Inc.*, 14 F. App'x 636, 639 (6th Cir. 2001)).  The Sixth Circuit has adopted the Eleventh Circuit's definition of the requirement which states:

> [W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. [However,] where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.

*Id.* at 553 (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312–13 (11th Cir. 1998)).

In the instant case, the parties indicated during a telephone conference in accordance with Local Rule 65.1 that neither party saw the need for a hearing to present testimony.  The parties indicated they would like to rely on the evidence attached to their motions.  As is shown through

---

[4] The Director also argues the preliminary injunction should be denied because Plaintiffs failed to exhaust their administrative remedies, which the Court has already addressed above.

the Court's discussion on the merits of the constitutional claims, and the parties' willingness to forgo a hearing, the material evidence is not in dispute. Thus, the Court will decide this motion without an evidentiary hearing.[5]

### ii. PLRA Three-Judge Court

The Director argues that the PLRA prohibits the Court from granting Plaintiffs' motion to the extent it asks for the release of prisoners. (Def. Director Resp. Prelim. Inj. at 21–22.) In civil actions concerning prison conditions, district courts cannot order the release of individuals in custody unless the "court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right" and "the defendant has had a reasonable amount of time to comply with the previous order." 18 U.S.C. § 3626(a)(3)(A)(i)–(ii). At this point, "[a] prisoner release order may be issued only by a three-judge court." *Id.* at § 3626(a)(3)(B). "[A] Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered." *Id.* § 3626(a)(3)(D); *see e.g., Coleman v. Newsom*, No. 2:09-cv-520, 2020 U.S. Dist. LEXIS 62575, at *24–25 (E.D. Cal. Apr. 4, 2020) (a three-judge court finding no previous order from a single judge finding a constitutional violation and thus holding the court without authority to release prisoners and instead instructing the plaintiffs to "go before a single judge and press their claim that [the defendants] response to the COVID-19 pandemic is constitutionally inadequate.").

The Director argues that Plaintiffs have not met the statutory pre-requisites of a finding of a constitutional violation, an order of less intrusive relief than release, and a reasonable amount of time for Defendants to comply, and thus, this Court does not have authority to release prisoners as

---

[5] The Court notes, however, it is reluctant to find state actions unconstitutional without an evidentiary hearing and instead relying solely on affidavits, declarations, and documents.

Plaintiffs request.  (Def. Director Resp. Prelim. Inj. at 21–22.)  Plaintiffs do not respond to this argument except to say in their conclusion that the PLRA does not apply.  (*See* Pls.' Resp. Prelim. Inj. at 14.)  The Director's argument is well-taken.

Plaintiffs have not previously obtained an order finding an unconstitutional action and requiring a remedy less intrusive than release and given Defendants reasonable time to comply. Thus, to the extent Plaintiffs seek release from prison the motion for a preliminary injunction is **DENIED**.  *See Maney v. Brown*, No. 6:20-cv-570, 2020 U.S. Dist. LEXIS 96661, at *37 (E.D. Or. June 1, 2020) (denying a preliminary injunction to the extent it sought release of prisoners to lower the prison population to combat COVID-19, finding the PLRA requirements had not been met); *Money v. Pritzker*, Nos. 20-cv-2093, 20-cv-2094, 2020 WL 1820660, at *12 (N.D. Ill. Apr. 10, 2020) (noting that to the extent the preliminary injunction asks for release of members of the prison population to combat COVID-19 it unquestionably could be awarded only by a three-judge court under the PLRA").

### b.  Likelihood of Success on the Merits

Plaintiffs bring this suit under Section 1983 which provides the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  A prima facie case under Section 1983 requires (1) conduct by an individual acting under color of state law, and (2) this conduct must deprive the plaintiff of rights secured by the Constitution or laws of the United States.  *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).  Section 1983 merely

provides a vehicle for enforcing individual rights found elsewhere and does not of itself establish any substantive rights.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

Here, Plaintiffs specifically assert that Defendants violated the Eighth Amendment's prohibition on cruel and unusual punishment and the Sixth Amendment's right to counsel. (Compl. ¶¶ 68–83.)  The Director plainly is a state actor, so the only question is whether the Director violated Plaintiffs' constitutional rights—or, more precisely, whether Plaintiffs have a reasonable chance of showing that they have been.

### i. Eighth Amendment Cruel & Unusual Punishment

The Eighth Amendment generally governs the provision of medical care in the jail setting. *See Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976).  "Deliberate indifference by prison officials to an inmates serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eighth Amendment's prohibition against cruel and unusual punishment."  *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (citing *Estelle*, 429 U.S. at 104); *see also Adkins v. Morgan Cnty.*, 798 F. App'x 858, 861–62 (6th Cir. 2020) (noting prison officials violated the Eighth Amendment when they acted with deliberate indifference" to a detainee's "serious medical needs.").  "Where any person acting under color of state law abridges rights secured by the Constitution or United States laws, including a detainee's Eighth . . . Amendment rights, § 1983 provides civil redress.  *Id.*

An Eighth Amendment challenge to the conditions of confinement has two components: one objective and the other subjective.  *See Farmer*, 511 U.S. at 834.  To satisfy the objective component, a prisoner must show "an objectively intolerably risk of harm."  *Id*.  The Sixth Circuit recently described the objective component as requiring a showing of "the existence of a sufficiently serious medical need, meaning that [the detainee] is incarcerated under conditions

posting a substantial risk of serious harm." *Adkins*, 798 F. App'x at 862 (quoting *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015)).

To satisfy the subjective component, a prisoner must show the prison official acted with deliberate indifference. *Farmer*, 511 U.S. at 834. A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837–38. Deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence." *Id.* at 835. The state of mind is something closer to criminal recklessness. *Id.* at 839–40. Acting with deliberate indifference is "tantamount to [an] intent to punish." *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (quoting *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).

In sum, a plaintiff must prove the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that he "drew th[at] inference." *Farmer*, 511 U.S. at 837. Because of the difficulty in proving an official's state of mind, the subjective component may be proven through circumstantial evidence. *Baynes*, 799 F.3d at 618. A court may also "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Terrance F. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

Here, Plaintiffs argue the objective component of this case is shown with "Defendants' own words, comments, and press briefings on this matter." (Pls.' Mot. Prelim. Inj. at 4.) Plaintiffs explain that the Director stated that when COVID-19 enters the prisons there is "no stopping it." (*Id.* (citing Governor Mike DeWine–4-30-202 –COVID-19 Update: https://ohiochannel.org/video/governor-mike-dewine-4-30-2020-covid-19-update).) The Director does not argue against the objective seriousness of COVID-19.

This Court agrees with the other district courts across the country who have found COVID-19 to be an objectively intolerable risk of harm to prisoners when it enters a prison. "There is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious and fatal harm to prison inmates." *Valentine*, 956 F.3d at 802; *see also Wilson v. Williams*, No. 4:20-cv-794, 2020 U.S. Dist. LEXIS 70674, at \*19–20 (N.D. Ohio Apr. 22, 2020) (finding petitioners obviously satisfied the objective requirement stating "[a]t this moment a deadly virus is spreading amongst [the prison] population and staff," which can lead to pneumonia, diminished oxygen, organ failure, and death.); *Money*, 2020 WL 1820660 at \*18 (noting that that "nobody contests the serious risk that COVID-19 poses to all inmates and prison staff, and even more to the most vulnerable inmates"); *Wilson v. Williams*, No. 20a0179p.06, 2020 U.S. App. LEXIS 18087, at \*21 (6th Cir. June 9, 2020) (finding a substantial risk of serious harm satisfying the objective element of the Eighth Amendment based on the conditions in an Ohio prison in light of COVID-19. The objective component is satisfied, and the Court moves to the subjective component.

Plaintiffs argue that, like the objective component, the Director's own statements "demonstrate [she is] aware of how dangerous the disease is." (Pls.' Mot. Prelim. Inj. at 5.) Additionally, Plaintiffs rely heavily on the lack of widespread testing in all of the ODRC's facilities as evidence of the ODRC's deliberate indifference to the prisoners' medical needs. (*See id.*; Pls.' Resp. Mots. Dismiss & Reply Prelim. Inj. at 9–10.) The Director responds by pointing to the hundreds of pages of evidence she provided showing she reasonably sought to implement responsive actions to the spread of the virus in accordance with CDC guidelines and after ongoing extensive consultation with ODH. (Def. Director Resp. Prelim. Inj. at 29.) These efforts are described above in the Court's relation of the Director's evidence. *See infra* Section I.3. Additionally, the Director argues that disagreement with the ODRC's medical decisions does not

establish deliberate indifference.  (*Id.* at 30.)  Finally, the Director argues that most of the relief

Plaintiffs seek has been implemented.  (*Id.* at 30–32.)  The Director's arguments are well-taken.

First, the Court generally agrees with Plaintiffs in their concern for the health and safety of

themselves and those in the ODRC's custody based on the number of COVID-19 infections and

deaths.  The Court does not seek to undermine the gravity of Plaintiffs' concerns.  The evidence

presented, however, does not show that Defendants were deliberately indifferent to the inmates'

needs.  In fact, the evidence shows an extensive effort to combat this new disease and protect the

prisoners' health and safety.

It is clear that the Director was aware of the risk COVID-19 presented based on her

statements about the disease and the extensive actions she took in response.  The key question is

whether the Director "responded reasonably to th[is] risk." *Wilson*, 2020 U.S. App. LEXIS 18087

at *22 (citing *Farmer*, 511 U.S. at 844).  Importantly, the resultant harm, while serious and

concerning, does not establish a liable state of mind.  *See Swain v. Junior*, 958 F.3d 1081, 1089

(11th Cir. 2020) (finding the district court incorrectly "treated an increase in COVID-19 infections

as proof that the defendants deliberately disregarded an intolerable risk").  Putting aside the

resultant harm, the evidence shows the Director responded reasonably to the risk.

The Director began preparing for the introduction of COVID-19 into Ohio's prisons before

COVID-19 was even confirmed in the United States.  (Def. Director Resp. Prelim. Inj. at Ex. A,

¶ 8.)  After COVID-19 entered the United States and then Ohio's prison system, the Director

continued to coordinate a response among all of ODRC's facilities which included educating staff

and inmates, tracking and distributing PPE, implementing social distancing measures among staff

and inmates, increasing cleaning and sanitizing, screening visitors, staff, and inmates, cancelling

visitation, quarantining those with symptoms, and implementing other policies designed to prevent

COVID-19's spread. (*See id.*) The Sixth Circuit has previously held actions such as these a reasonable response. *See e.g., Wilson*, 2020 U.S. App. LEXIS 18087 at *23 (finding the Bureau of Prisons' response to COVID-19 including screening for symptoms, educating staff and inmates, cancelling visitation, quarantining new inmates, implementing cleaning, providing disinfectant, and more, a reasonable response); *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010) (holding a jail nurse's actions of cleaning every cell, quarantining infected inmates, and distributing information about a bacterial disease precluded a finding of deliberate indifference).

Other courts around the country have also found similar actions taken in response to COVID-19 enough to preclude a finding of deliberate indifference. *See e.g.*, *Valentine*, 956 F.3d at 802 (noting that the prison officials took measures recommended by the CDC and the plaintiffs offered no evidence they subjectively believed those actions were inadequate); *Swain*, 958 F.3d at 1089 (noting that neither the resultant harm in COVID-19 infections or the inability to achieve social distancing constituted a state of mind more blameworthy than negligence); *Money*, 2020 WL 1820660 at *18 (finding the plaintiffs did not have a chance of success on this claim because the prison officials had come forth with a lengthy list of actions they had taken to try and protect inmates from COVID-19 and "the record simply [did] not support any suggestion that [the defendants] ha[d] turned the kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for the inmates' welfare" (citing *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012))). There is no evidence that the Director subjectively believed her actions were inadequate or that she indicated a total concern for the inmates' welfare.

Plaintiffs' claim that the amount of testing shows deliberate indifference is unpersuasive because "[a]n inmate's disagreement with the testing and treatment he has received . . . does not rise to the level of an Eighth Amendment violation." *Id.* (internal citations omitted). Importantly,

Sixth Circuit precedent "do[es] not require that prison officials take every possible step to address a serious risk of harm." *Wilson*, 2020 U.S. App. LEXIS 18087 at *30–31 (citing cases).

In sum, Plaintiffs have not provided sufficient evidence to show that the Director was deliberately indifferent to the serious risk presented by COVID-19 inside of Ohio's prisons. This finding is dispositive of Plaintiffs' Eighth Amendment claim as courts cannot issue a preliminary injunction where the movant presents no likelihood of success on the merits. *Wilson*, 2020 U.S. App. LEXIS 18087 at *32. Although the Court's analysis of the claim could end here, it will nevertheless examine the remaining factors. Additionally, the Sixth Amendment claim remains.

### ii. Sixth Amendment Right to Counsel

The Sixth Amendment provides that "[i]in all criminal prosecutions, the accused shall enjoy the right to . . . the [a]ssistance of [c]ounsel for his defence." U.S. Const.amend.VI. Once an "adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 129 S. Ct. 2079, 2085 (2009). For purposes of the right to counsel, the Supreme Court has "pegged commencement of the judicial process" to "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (citing *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). The right to counsel extends to the first appeal of right, but no further. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). The Supreme Court has declined to extend the right to counsel to discretionary appeals and other postconviction relief. *See id.*; *Murray v. Giarratano*, 492 U.S. 1, 8–9 (1999). Additionally, "[a]ppointment of counsel in a civil case is not a constitutional right" but instead is "a privilege that is justified only by exceptional circumstances." *Lavado v. Koehane*, 992 F.2d 601, 606 (6th Cir. 1993).

Plaintiffs argue that their "inability to have any meaningful relationship and communication with their attorneys destroys their access to the courts and renders them virtually unable to raise challenges to the conditions of their confinement." (Pls.' Mot. Prelim. Inj. at 7.) In response, the Director contends that Plaintiffs have not alleged they have any ongoing criminal proceedings to which the right to counsel would attach, thus, the Sixth Amendment does not apply to them. (Def. Director Resp. Prelim. Inj. at 38–39.) In reply, Plaintiffs do not respond to or dispute this point. (*See* Pls.' Resp. Mots. Dismiss & Reply Prelim. Inj. at 10–12.)

The Court agrees with the Director. Plaintiffs have not alleged any litigation or case which Plaintiffs are involved in, to which the Sixth Amendment would attach. Additionally, even if Plaintiffs did prove their Sixth Amendment rights attached, it is not clear they could have proven a likelihood of success on the merits because the evidence is highly conflicting and favors Defendants. First, while Plaintiffs provide some evidence that there have been instances where an attorney has been prevented from seeing an inmate, they have not argued or provided evidence that any of Plaintiffs themselves have been denied access to their counsel. In contrast, the evidence shows Plaintiff Smith did have access to his counsel on June 4, 2020. (Def. Director Resp. Prelim. Inj. at Ex. G, ¶ 17.). Additionally, the Director provides evidence that the wardens of each facility were specifically instructed to ensure attorneys had access to their clients. (*See id.* at Ex. A, ¶¶7, 99.) Further, the administrative assistants and secretaries of the facilities where Plaintiffs are housed testified that they did not deny attorneys access to their clients, and instead had protocols in place to ensure access was provided. (*See id.* at Ex. D–I.)

Plaintiffs rely on cases in which prisoners brought claims under the Fourteenth Amendment for a violation of their right to access the courts. (*See* Pls.' Prelim. Inj. at 6–7.) In these cases, the defendants denied the prisoners' rights to the courts because the prisoners could not access legal

materials or the facts of their cases, while imprisoned.  *See Bounds v. Smith*, 430 U.S. 817 (1997) (finding that the prisoners' fourteenth amendment rights to access the courts were violated when the prisoners were not provided any access to legal knowledge through a library or other resources); *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984) (affirming the district court's finding that the police denied a prisoner's fourteenth amendment right to access the courts when he prevented the prisoner from discovering facts which formed the basis of the plaintiff's claim); *Penrod v. Zavaras*, 94 F.3d 1399, 1403–04 (10th Cir. 1996) (finding the plaintiff's Fourteenth Amendment right to access the courts was not violated because he was able to access the library for a few hours each week).

These cases are inapposite here for several reasons.  First, Plaintiffs brought their claim under the Sixth Amendment for a violation of their right to counsel, not under the Fourteenth Amendment for a violation of their right to access the courts.  (*See* Compl. ¶¶ 78–83.)  Second, even if they had brought a claim under the Fourteenth Amendment for a violation of their right to access the courts, they have made no allegations, and there are no facts to suggest, that the Director prevented Plaintiffs from accessing legal resources or hid the facts of their cases.  In fact, the evidence shows the Director ensured Plaintiffs did have access to library materials even during the pandemic.  (Def. Director Resp. Prelim. Inj. at Ex. A, ¶ 71 ("Library materials were divided and distributed to cohorts to minimize contamination and ensure social distancing.").)  The cases Plaintiffs rely on are simply inapplicable to the facts of this case.

In sum, because Plaintiffs have neither provided evidence that the Sixth Amendment has attached to them or that they were actually denied access to their counsel, they are not likely to succeed on the merits of the Sixth Amendment claim.  This finding is dispositive of Plaintiffs' Sixth Amendment claim as courts cannot issue a preliminary injunction where the movant presents

no likelihood of success on the merits. *Wilson*, 2020 U.S. App. LEXIS 18087 at *32. Although the Court's analysis of the claim could end here, it will nevertheless examine the remaining factors.

### c. Irreparable Harm

Plaintiffs argue that even the temporary loss of a constitutional right establishes irreparable injury. (Pls.' Mot. Prelim. Inj. at 2 (citing *Elrod v. Burns*, 427 U.S. 347 (1976).) The Director argues that because the ODRC as already implemented almost every measure Plaintiffs seek, they will not suffer any further harm without this injunction. (Def. Director Resp. Prelim. Inj. at 41–42.) Additionally, the Director points out that there is no evidence of specific harm on the record for only two of Plaintiffs have contracted COVID-19, both of whom were asymptomatic and have recovered. (*See id.*)

The Court agrees with the Director. The Director has submitted evidence showing many of the requested actions have already been taken. (*See* Def. Director Resp. Prelim. Inj. at Ex. A.) Thus, absent this injunction Plaintiffs' situation is not likely to be any different than it would be with the preliminary injunction. Importantly, as discussed above, this Court does not have the authority to release prisoners, and thus, is evaluating the preliminary injunction based solely on the Plaintiffs' other requested orders.[6] The Court does not disagree with Plaintiffs that they currently face the risk of serious harm due to the COVID-19 pandemic. They have not shown, however, that this harm is likely to come into fruition based on the lack of this injunction. *See Swain*, 958 F.3d at 1090 (noting that the question is not whether COVID-19 presents a danger to inmates, but whether the plaintiffs would suffer irreparable injuries absent the injunction). Additionally, Plaintiffs' argument regarding violations of the Constitution is not persuasive

---

[6] Even if the Court could implement the requested relief and release Plaintiffs, at least two of Plaintiffs have not shown irreparable harm because they have already contracted COVID-19, had no symptoms, and recovered. Thus, absent the injunction allowing release they are unlikely to catch the disease again and if they do are unlikely to become seriously ill.

because they have not shown they are likely to be successful on a claim for a constitutional violation.  *See infra* Sections III.3.b.i–ii.

### d.  Balance of Harms and Public Interest

Plaintiffs argue that the public interest and the balance of harms falls on the side of the "correct application of constitutional protections."  (Pls.' Mot. Prelim. Inj. at 8.)  Further, Plaintiffs allege the Director will not be harmed by the injunction.  (*See id.*)  In contrast, the Director argues that it is the responsibility of the states, not the federal courts, to craft policies addressing the pandemic.  (Def. Director Resp. Prelim. Inj. at 43.)  The Director notes that Ohio "has a compelling interest in preventing the spread of a novel, highly contagious, sometimes fatal virus."  (*Id.* at 44 (quoting *Marysville Baptist Church Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020).)

The Supreme Court has repeatedly warned that "it is 'difficult to imagine an activity in which a state has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."  *Woodford*, 548 U.S. at 94 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)); *see also Missouri v. Jenkins*, 495 U.S. 33, 51 (1990); *Turner v. Safley*, 482 U.S. 78, 85 (1986) ("[W]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities."); *Meacham v. Fano*, 427 U.S. 215, 229 (1976) ("Federal courts do not sit to supervise state prisons, the administration of which is of acute interests to the States.").

Here, the balance of harms favors the Director.  As explained above, Plaintiffs are unlikely to be protected from suffering any harm with the injunction that they would not have suffered absent the injunction.  In contrast, ordering the state prisons to operate according to the Court's directives would be greatly intrusive.  As other courts considering prisons' responses to COVID-19 have recognized, any injunctive relief would implicate important federalism and separation of

powers concerns. *See Maney*, 2020 U.S. Dist. LEXIS 96661 at *59 (expressing concern about federalism and the separation of powers in the plaintiffs' request for interference with state prisons); *Money*, 2020 U.S. Dist. LEXIS 63599 at *16–17 (explaining that "running and overseeing prisons is traditionally the province of the executive and legislative branches" and that "the public interest also commands respect for federalism and comity, which means that courts must approach the entire enterprise of federal judicial instruction into the core activities of the state cautiously and with humility"); *Valentine*, 2020 U.S. Dist. LEXIS 68644 at *14 (noting that "courts are ill equipped to undertake the task of prison administration, which is within the province of the legislative and executive branches of government" (internal citations omitted)).

In addition to federalism and separation of powers concerns, ordering prisons to be run in accordance with a court order would be difficult in light of COVID-19 which is rapidly changing along with the science on how best to combat it.

Weighing all of the factors, the Court concludes a preliminary injunction is not warranted as all four factors weigh against granting a preliminary injunction.

### III. CONCLUSION

For the reasons stated herein, the Director's Motion to Dismiss (ECF No. 23) is **GRANTED in part and DENIED in part**, the Governor's Motion to Dismiss (ECF No. 26) is **GRANTED**, and Plaintiffs' Motion for a Preliminary Injunction (ECF No. 13) is **DENIED**.  The Clerk is **DIRECTED** to terminate Governor Mike DeWine from this case.

**IT IS SO ORDERED.**


**8/3/2020**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                        **EDMUND A. SARGUS, JR.**
                                                **UNITED STATES DISTRICT JUDGE**